Argued October 8; affirmed December 8, 1931

# HISE v. CITY OF NORTH BEND ET AL.

### (6 P. (2d) 30)

*L. A. Liljeqvist,* of Marshfield (J. G. Mullen, of North Bend, on the brief), for appellant.

*Mark Weatherford,* of Albany (Weatherford & Wyatt, of Albany, and J. Arthur Berg, of Coquille, on the brief), for respondent.

ROSSMAN, J. We shall first consider the assignments of error based upon the rulings of the circuit court which denied the city's motion for a directed verdict and which entered judgment in favor of the plaintiff upon the verdict. A brief summary of the evidence favorable to the verdict is deemed advisable.

Prior to November 3, 1926, the plaintiff, who was an intelligent young man, 26 years of age, had never been in the city of North Bend and was entirely unfamiliar with its streets and wharf. Upon that day he left Eugene in his automobile with the intention of going to Giddon's Camp at Lakeside across the bay from North Bend. He arrived in the latter city about 6 o'clock p. m. and stopped for a few minutes at a restaurant where he ate dinner. At that place he was informed that the ferry which he would be required to board in order to cross the bay on his way to Lakeside had ceased operations for the day, and then concluded that he would return to Marshfield about three miles distant. In going from Marshfield to North Bend he drove along Waterfront road which is paved with bitulithic pavement and which parallels a railroad track, but nowhere crosses it. Waterfront road becomes Stanton avenue as it enters North Bend and the latter thoroughfare terminates when it reaches Washington avenue whose course is at right angles to Stanton avenue. At this point a fence, painted with light-colored paint, warns the automobilist of the termination of Stanton avenue and a sign directs him to turn to the left if he desires to proceed to the business sec-

tion of North Bend. The plaintiff turned to the left and drove two blocks up Washington avenue to Sherman avenue, which is the principal street of the city, and then turned to his right down Sherman avenue until he had gone one block and had crossed Virginia street. Here he found the aforementioned restaurant and stopped. After having eaten his meal and having decided to return to Marshfield for the night, he drove along Sherman avenue a block or two more and then reversed his direction with the intention of retracing his course back to Marshfield. The evidence shows that the night was dark and that the air was charged with fog to such an extent that travelers had very little vision. The plaintiff testified that he could see only twenty feet ahead, and that when he came to Virginia street he turned to his left, having mistaken it for Washington avenue. He added that his lights were burning, that he was driving at a speed of not more than five or eight miles per hour, and that he was looking alertly for the fence he had seen at the place where Stanton avenue ended. Seven hundred seventy-four and one-half (774½) feet directly down Washington avenue, which was paved and improved for vehicular traffic, was the approach to the municipal wharf. At the edge of the wharf, which was 72 feet wide, there was no barricade, gate or sill to prevent a car from running off of it into the waters of the bay, thirty feet deep at that point. There were no warning lights, signs, or other indications of danger to apprise an automobilist of what lay ahead. The distance from the intersection of Sherman and Washington avenues to Stanton and Washington avenues was 480 feet. The character and width of the hard-surfaced pavement along Virginia street was practically the same as that along Washington avenue for a distance of 460 feet.

The 460-foot stretch of bitulithic pavement along Washington avenue, just mentioned, was followed by a section of plank roadway 171½ feet in length and somewhat wider than the preceding bitulithic pavement. It is crossed by two railroad tracks, and is continued by another section of plank roadway 143½ feet long and 24 feet wide, at the conclusion of which is another section of plank roadway 153½ feet long and 24 feet wide which was constructed by the city upon land conveyed to it in fee simple. It constitutes the approach to the municipal wharf and is regarded as a portion of that landing-place. It is conceded that the city possessed sufficient power to enable it to maintain the wharf. As the plaintiff left the 135½-foot section of plank road just described, he came directly upon the main structure of the wharf which is 389 feet long and 72 feet wide. The longer dimension is at right angles to the approach and parallels the water's edge. The approach met the wharf at approximately its middle point. To the left, and about 30 feet from the point where the approach enters the wharf, was a warehouse structure; ahead, the way was clear; to the right was open space, free from all structures and other objects. Thus when the plaintiff left the approach and came upon the wharf he had only 72 feet more to go until he was at the dock's edge with the deep water below. As previously stated, there was no barricade or other obstruction to impede his progress and no sign, light or any other device to signal danger. He proceeded, still believing that he was upon the course which would return him to Marshfield, and, after having gone the additional 72 feet, was hurled into the waters of the bay. The injury which he sustained is the basis of this action.

The two assignments of error now under consideration are based upon the contentions: (1) that a charter provision of the city exempted it from this liability; and (2) that before erecting the wharf the city exercised due care in selecting an engineer to plan the installation; that after he had submitted his designs the city council approved them and later built the structure in precise conformity to the plans.

The charter provision above mentioned is as follows:

"No recourse shall be had against the city for damage or loss to person or property suffered or sustained by reason of the defective condition of any sidewalk, street, avenue, boulevard, alley, court or place, or by reason of the defective condition of any sewer, or by reason of any defective drainage, whether any of said defects originally existed, or whether they were occasioned by construction, excavation or embankment; nor shall there be any recourse against the city for want of repair of any sidewalk, street, avenue, boulevard, alley, court or place, or by want of repair of any sewer; nor shall there be any recourse against the city for damage to person or property suffered or sustained by the reason of accident on sidewalk, street, avenue, boulevard, alley, court or place, or by falling from an embankment thereon or into any excavation therein but in such case, the person or persons on whom the law might have imposed the obligation to repair such defect in the sidewalk, street, or public highway, or in the sewer, and also the officer or officers through whose official negligence such defect remains unrepaired shall be jointly and severally liable to the party injured for the damage sustained."

Section 5-502, Oregon Code 1930, authorizes the institution of actions against municipalities in their "corporate character."

The defendant seems to believe that the place which the plaintiff claims was dangerous is within the

protection of the above charter provision. It will be observed that the plaintiff had been operating his car upon the wharf premises for 225½ feet before he fell into the water. Obviously, the city's contentions can not be sustained unless the place described by the plaintiff was one of those mentioned in the above charter provision. Apparently, the city believes that the word "place" found in the above provisions is applicable to the wharf. The principle of ejusdem generis frequently employed in the construction of statutes suggests that where general words follow the enumeration of particular classes of persons or things, the general words shall be construed as applicable only to persons or things of the same general nature or kind as those enumerated. The rule finds support in the conviction that if the legislature had intended the general words to be used in their unrestricted sense it would have made no mention of the particular classes: *Moen v. Aitken,* 127 Or. 246 (271 P. 730); *Bottig v. Polsky,* 101 Or. 530 (201 P. 188); *O'Neill v. Odd Fellows Home,* 89 Or. 382 (174 P. 148). When the city of North Bend provided itself with streets, avenues, boulevards, etc., it exercised that element of its dual functions which is governmental or political, but when it began the operation of a municipal wharf for the commercial advantage of the city and its adjacent territory, and levied wharfage charges, it was exercising a purely corporate, proprietary or private function: *Dix v. Port of Port Orford,* 131 Or. 157 (282 P. 109); *Bennett v. City of Portland,* 124 Or. 691 (265 P. 433); *Mackay v. Commission of Port of Toledo,* 77 Or. 611 (152 P. 250); *Esberg Cigar Co. v. Portland,* 34 Or. 290 (55 P. 961, 43 L. R. A. 435, 75 Am. St. Rep. 651). A municipality in a restricted sense is a governmental agency vested with the powers of sovereignty. When its

officials are engaged in the performance of public service in which the municipal corporation has no special interest and from which it derives no special benefit, the "officials are not, strictly speaking, the servants and agents of the municipalities through which they derive their authority, but are officers, agents, and servants of the state (that is, the political divisions thereof, or the public at large)": *Wagner v. Portland,* 40 Or. 389 (60 P. 985, 67 P. 300). And, hence, it necessarily follows that the municipality may properly be granted immunity from liability from their acts just like the state would be immune if they were acting directly for it. But when the municipality exercises its proprietary or corporate authority and engages in a business enterprise for the commercial advantage of those whose interests it serves, it possesses no immunity from liability, in the absence of special exemption, but is subject to suit to the same extent as any individual similarly engaged. This important difference in the dual elements of the city's nature seems to be a proper matter for consideration when determining whether the word "place," if interpreted to mean "wharf", would be ejusdem generis with street, boulevard, etc. We believe that it must be manifest from the foregoing that in addition to the self-evident difference between a wharf and a public thoroughfare there is such a very important difference in the municipal authority exercised in the establishment and control of a wharf as distinguished from a street that the two do not belong to the same class. We are convinced that "place" was employed in this charter provision to include a common passageway employed for traffic purposes, and not the location of some private enterprise conducted by the city. We are particularly persuaded to this conclusion by the appearance of the word "highway".

in one of the sentences of this charter provision where it obviously was intended to include "avenue, boulevard, alley, court or place," and by the fact that all of the activities definitely named in this paragraph are of a governmental type. Moreover, the rules of construction, applicable to the interpretation of a charter provision which exempts a city from liability, demand that doubts as to whether a particular case falls within the exemption should be resolved against the municipality: *Birmingham v. Starr*, 112 Ala. 98 (20 So. 424); *Schultz v. Phoenix*, 18 Ariz. 35 (156 P. 75); *Pardini v. City of Reno*, 50 Nev. 392 (263 P. 768). Applying these rules to the charter provision before us, and guided by what appears to us as the intended meaning of the words used, it is our opinion that the charter provision was not intended to absolve the city from liability for any wrongs done by it upon its municipal wharf. In announcing this conclusion, we express no opinion upon the problem whether a city charter granted by the means authorized by article XI, section 2, Oregon Constitution, as distinguished from one obtained from the legislature, can free a municipality from liability when a general statute like section 5-502, Oregon Code 1930, subjects cities to liability. It is unnecessary for us to do so. We notice, however, that in another jurisdiction the courts have held that cities could not obtain exemption in the manner employed by the city of North Bend: *Green v. City of Amarillo*, 244 S. W. 241; *City of Amarillo v. Tutor*, 267 S. W. 697.

■ The second subdivision of the above contention submits that since the evidence shows that the city exercised due care in the selection of the engineer who designed this wharf, and indicates that it constructed the wharf in conformity with his plans, it can not be

liable even though the structure was not properly built. This argument is founded upon the proposition that the selection of plans for the improvement was the exercise of a judicial function. It is true that section, 565, Elliott, Roads and Streets (3d Ed.), relied upon by the appellant, contains general language capable of supporting a conclusion that the rule extends to the construction and maintenance of public works of a proprietary or corporate character. But a consideration of the numerous authorities cited by the writer readily dispels all doubt and shows that the rule is applicable only to the construction and maintenance of streets, sidewalks, sewers, etc.; in other words, to works of a governmental character. We have previously expressed our conclusion that the operation of this wharf constituted the exercise by the municipality of a purely corporate function; that is, it was the doing of something for the commercial advantage of the community. It is well settled that when a municipal corporation exercises a corporate function as distinguished from its governmental powers, it stands upon the same footing with private corporations and is held to the same responsibility as the latter for injuries resulting from its negligence: *Butler v. City of McMinnville,* 126 Or. 56 (268 P. 760, 59 A. L. R. 381); *Twohy Bros. Co. v. Ochoco Irr. Dist.,* 108 Or. 1 (210 P. 873, 216 P. 189); *Ryder v. La Grande,* 73 Or. 227 (144 P. 471); *Blake-McFall v. Portland,* 68 Or. 126 (135 P. 873); *Pacific Paper Co. v. Portland,* 68 Or. 120 (135 P. 871); McQuillin, Municipal Corporations (2d Ed.), section 2799. Nothing contained in *Giaconi v. City of Astoria,* 60 Or. 12 (113 P. 855, 118 P. 180, 37 L. R. A. (N. S.) 1150), relied upon by appellant, is at variance with these conclusions; in fact, it expressly recognizes the distinction in liability attached to an injury arising from the doing

of an act governmental in character as distinguished from a ministerial one. Moreover, we find nothing in the evidence which would warrant a conclusion that the engineer who was employed to design the dock was expected to suggest safety signals and other devices for the public's protection. Apparently, he felt that he was required to design a dock well adapted to the needs of shipping only. For instance, he was asked: "And you built it and it has been that way ever since and they never told you to put any signs up, did they?" A. "No, they gave me no instructions except as to the designing of it."

■■ The city next argues that the circuit court erred when it refused to instruct the jury as follows: "If you find that the plaintiff drove out and upon the wharf of the defendant, the city of North Bend, and therefrom into the waters of Coos Bay and that at the time he did so, he was upon said wharf without the invitation, express or implied, of the defendant city of North Bend, nor with its consent, nor on any business connected with said wharf, he was at that time a bare licensee." As will be observed from the evidence previously reviewed, Virginia street led directly to this wharf and the latter was only 775 feet from the center of the city. No obstructions or gates prevented free access to the wharf. No signs forbade the public from entering upon any part of it. Although the members of the city council knew that the wharf was being daily used by the public no effort was made to obstruct access to it. For instance, one of the councilmen was asked: "And you knew it was being traveled by the public?" A. "Yes." Another one was asked: "And you knew this Virginia street extended and was used by automobiles and trucks and pedestrians?" A. "Yes, sir." Q. "Going to the dock and

back?" A. "Yes, sir." Q. "You knew of no sign or anything notifying a stranger or anyone that this street led to the dock?" A. "No, * * *." An invitee is one who possesses an invitation, either express or implied. The following is quoted from *Kruntorad v. Chicago R. I. & P. R. Co.,* 111 Neb. 753 (197 N. W. 611): "An invitation is inferred when there is a common interest or mutual advantage, or where an owner or occupant of premises, by acts or conduct, leads another to believe the premises, or something thereon, were intended to be used by such other person; that such use is not only acquiesced in by the owner or occupant, but is in accordance with the intention or design for which the way, place or thing was adapted or prepared or allowed to be used." From Gould on Waters (3d Ed.), § 119, we quote: "The question whether a wharf is public or private depends upon the purpose for which it is built, the uses to which it has been applied, the place where located, and the nature and character of the structure. When a public highway is laid out to navigable waters, its termination is presumed to be a public landing as incident to the highway." It seems to us that the above conduct upon the part of the city could readily warrant a finding that an invitation, at least an implied one, had been extended to the general public, including the plaintiff, to enter upon the wharf: *Bennett v. City of Portland,* 124 Or. 691 (265 P. 433); 45 C. J., Negligence, p. 808, § 218. See, also, *Gray v. King County,* 140 Wash. 169 (248 P. 397). The court's instruction upon the duty which the city owed to the plaintiff were very fair, and possessed the virtue of being readily understandable by the layman. They enunciated not only the law without using the troublesome word "invitee" but also showed its application to the facts. Those sug-

gested by the city could readily have caused the jury to understand that facts vouched for by its witnesses, and which impliedly invited the plaintiff to enter upon the wharf were open to dispute. No error was committed when the requested instruction was rejected.

■ Since we have concluded that the evidence was capable of sustaining a finding that the plaintiff had been invited upon the wharf, it necessarily follows that it was the duty of the city to exercise reasonable care for his safety: *Lange v. St. Johns Lumber Co.,* 115 Or. 337 (237 P. 696).

■ The city argues that since the jury returned a verdict in favor of the councilmen, it necessarily follows that the city also must be discharged, although the verdict was adverse to it. Where a principal is liable for the tortious negligence of his agent, the latter is both jointly and severally liable with him: Shearman & Redfield on Negligence (6th Ed.), section 122. Since the liability is a joint and several one, it would be as proper to conclude that a verdict against the city demanded a judgment against both principal and agent as to conclude that a verdict against the principal, but in favor of the agent, demanded a judgment favorable to both. It has been held in situations analogous to the present one, that is, where an action of negligence was instituted against a principal and agent, with a verdict against the one but favorable to the other, that a judgment entered upon the verdict must be sustained: *Illinois C. R. Co. v. Murphy,* 123 Ky. 787 (97 S. W. 729), 11 L. R. A. (N. S.) 352. If the plaintiff, through the errors of the jury, obtained a judgment against one party only when he was entitled to judgment against two, he and not the city is the party aggrieved: *Chambless v. Melton,* 127 Ga. 414

(56 S. E. 414) ; *Matthews v. Delaware L. & W. R. Co.,*
56 N. J. L. 34 (27 Atl. 919, 22 L. R. A. 261) ; 38 Cyc.,
Trial, 1883. It is our opinion that a verdict for the
councilmen does not demand a judgment for the city.

■ The city argues that the trial court erred when it
declined to instruct the jury thus: "If you find that
the defendant city constructed and maintained its
wharf in the customary, ordinary and usual manner in
which wharves under similar circumstances are con-
structed and maintained, then I instruct you that the
defendants can not be charged with negligence if such
wharf was so constructed and maintained."

The court instructed upon the effect of the evi-
dence showing custom as follows: "It would be proper
for you to consider evidence of customary methods
under similar conditions, and you should give such evi-
dence, if any, such weight as you may find it to merit
along with all of the other evidence in the case in de-
termining what was reasonable care in this case. In
weighing such evidence you should, of course, con-
sider the similarity or dissimilarity of the conditions
in other cases compared to this case. Custom is some
evidence that the customary practice is reasonably
careful practice, but where there is direct evidence
on the issue, custom alone would not be conclusive as
to what is reasonably prudent practice."

We quote from Shearman & Redfield on Negli-
gence (6th Ed.), § 12a: "The custom of others engaged
in the same pursuit, though generally admissible in
evidence by either party as tending to show negligence
or the contrary, is not conclusive. 'What usually is
done, may be evidence of what ought to be done, but
what ought to be done is fixed by a standard of reason-
able prudence, whether it usually is complied with or
not.' And it has been held that evidence of the usual

method of doing the particular business may be received without such evidence as is in general necessary to establish a custom.''

From Thompson on Negligence (White's Supplement), § 3777, we quote: ''The Supreme Court of the United States has said that 'What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not'.''

From 45 C. J., Negligence, p. 706, § 87, we quote: ''The more generally accepted view, however, is that customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence, or fix a standard by which negligence is to be gauged. The standard of due care is such care as a prudent person would exercise under the circumstances of the particular case, and conformity to customary or usual conduct or methods can not amount to more than a circumstance to be considered together with other circumstances of the care in determining whether due care has been exercised.''

From *Richardson v. Klamath S. S. Co.*, 62 Or. 490 (126 P. 24), we quote: ''This charge correctly illustrates the principle affecting the defendant that, although the custom had been observed in piling the lumber, yet if it was in fact dangerous, and the defendant knew it was dangerous, or might have known it by the exercise of reasonable care, the custom would not excuse the negligence of the defendant in not providing against the peril to the laborers * * * But it was error to assume, as it did in the instruction, as a matter of law, that the observance of the custom exonerated the plaintiff from the charge of contributory negligence. The only evidential purpose of custom in such cases is to more fully explain the situation

to the jurors and assist them in determining whether, as against the defense of contributory negligence the plaintiff did the work as a reasonably careful man would have performed it under all the attending conditions of which the customary way was only one."

From *Myrtle Point Transp. Co. v. Port of Coquille River*, 86 Or. 311, (168 P. 625), we quote: "It is true, as contended by the defendant, that a party is not to be excused from negligence on the ground that others are in the habit of acting negligently."

We have considered the proposition of law embraced in this assignment of error at length because of the fact that a statement in *Oregon Box, Etc., Co. v. Jones Lumber Co.*, 117 Or. 411 (244 P. 313), indicates that conformity to custom satisfies the demands of due care. We are convinced that that holding is in error, that the trial judge's instruction is without error, and that the requested instruction was properly denied.

■ Appellant complains because the trial court did not read to the jury the city's requested instruction upon contributory negligence and its effect. The instruction given was comprehensive and incorporated every material feature of the one suggested by the city; in fact, appellant's dissatisfaction seems to be with the verdict rather than with the instruction. Whether the plaintiff was guilty of contributory negligence was a question of fact for the jury. This assignment of error possesses no merit.

We have carefully considered all other assignments of error, but find them to be without merit and they present no occasion for comment.

It follows that the judgment of the circuit court will be affirmed.