Argued May 16, reversed and remanded June 30, petition for
rehearing denied August 29, 1950

MILES ET AL. *v.* VEATCH ET AL.
COLUMBIA RIVER FISHERMEN'S PROTEC-
TIVE UNION ET AL., Intervenors-Appellants

220 P. (2d) 511
221 P. (2d) 905

510

*Cecil Quesseth,* Assistant Attorney General, argued the cause for appellants. With him on the brief was George Neuner, Attorney General of Oregon, both of Salem.

*A. C. Fulton,* of Astoria, and *Jay Bowerman,* of Portland, argued the cause and filed a brief for respondents.

*Ben Anderson* argued the cause for intervenors-appellants. On the brief were Anderson & Franklin, of Portland.

Before Lusk, Chief Justice, and Brand, Belt, Rossman, Hay, and Latourette, Justices.

HAY, J.

In this case plaintiffs sought a declaratory judgment that chapter 3, Oregon Laws 1949, is unconstitutional and void, and an injunction against the public

authorities to prevent them from enforcing such act.

Plaintiffs are drag seine fishermen, pursuing their calling upon the Columbia River in Oregon. We shall refer to them either as "plaintiffs" or as "the seiners".

Defendants are the members of the Fish Commission of the State of Oregon, the State Master Fish Warden, and the Department of State Police. For convenience, we shall refer to them collectively as "the Commission".

Certain other persons, who are gill-net fishermen upon the Columbia River and an incorporated labor union whose members are such gill-net fishermen, intervened in the action by permission of the circuit court. These intervenors will be referred to herein as "the gill-netters".

The initiative act prohibits the taking of salmon, salmon trout or steelhead by means of "fixed" fishing appliances in any of the waters of the Columbia River or its tributaries in the state of Oregon. The act does not apply to fishing by Indians under federal regulations, or to the taking of fish for propagation or scientific purposes by the state or national governments.

The amended complaint alleges substantially as follows: The individual plaintiffs are owners or lessees of certain shorelands or tidelands or islands in the Columbia River in Oregon, suitable and for many years used for drag seine fishing operations. Plaintiffs, Columbia River Packers Association, Inc. and H. K. Parker, are duly licensed by the state of Oregon to operate drag seines. Each of the plaintiffs owns the equipment required to operate a drag seine on his respective property. This equipment represents an in-

vestment, the total value of which is in excess of $140,400.00. The drag seines are suitable only for drag seine 'fishing, and have no value for any other purpose. The individual plaintiffs are fishermen of wide experience, possessing the necessary skill to enable them to follow the business of drag seine fishing as a lifetime occupation. They have, moreover, established excellent reputations as drag seine fishermen, and their catch is in demand in the fish markets. Their ages run from 25 to 60 years and over. They are for the most part men of family, home owners and taxpayers. If they are denied the right to follow their life vocation of drag seine fishing, they will lose not only the value of their fishing equipment and shorelands and islands, but also their ability to support and maintain their families.

Various kinds of fishing equipment are used in catching food fishes in the Columbia River, but, if the initiative act is adjudged to be valid and enforceable, only drift gill-net equipment will be "legal".

The latest complete tabulations of the catch of food fish in the Columbia River, according to the records of the Commission, are those for the years 1945 and 1946, which are as follows: [Presumably the figures given represent pounds.]

| | Total Catch | |
|---|---|---|
| | 1945 | 1946 |
| Gill net | 7,981,915 | 7,516,806 |
| Set net | 238,056 | 292,292 |
| Dip net | 1,016,500 | 1,468,147 |
| Seine | 2,117,188 | 2,659,383 |
| Trap | 1,028,523 | 849,734 |
| Set line | 55,744 | 83,054 |
| Miscellaneous | 252,000 | 3,203 |

On November 2, 1948, chapter 3, Oregon Laws 1949, was adopted by the people of Oregon under initiative process. There is exhibited a copy of the initiative bill, including the legislative title, the short ballot title, and the general ballot title. By the legislative title, the proposed act was limited in its effect to the taking of salmon by the use of drag and whip seines, fish traps and other fixed appliances, but section 1 goes beyond the limits of the title by making it unlawful to use any drag seine in the Columbia River or its tributaries, and section 2 likewise goes beyond the limits of the title by making it unlawful to use, within said waters, any pound net, fish trap, fish wheel, scow fish wheel, set net, or weir, or any fixed appliances for the purpose of catching salmon trout or steelhead. Section 3 undertakes absolutely to prohibit the use of whip seines for any purpose in said river, although it is customary to use whip seines therein for the capture of any type of commercial fish when lawful to do so.

The ballot title and general title were confusing and misleading, in that they included whip seines and fish wheels, whereas the taking of salmon, shad, sturgeon or other anadromous or food or shell fishes in the Columbia River in this state has been unlawful since 1923, (Sec. 83-614, O. C. L. A.), and the use of fish wheels in the Columbia River in Oregon has been unlawful since 1927. (Sec. 83-513, O. C. L. A.) The short ballot title was defective, misleading and confusing in that it purported to prohibit fishing for salmon in the Columbia River with fixed appliances, whereas the general ballot title and the body of the act purported to prohibit fishing for salmon, salmon trout and steelhead with drag seine, "which is not a fixed

appliance." There follows a description of a drag seine and the method of its operation in fishing. Drag seines are not fixed appliances, and are recognized by the state in its commercial fishing license provisions as not being fixed appliances. Section 83-615, O. C. L. A., classifies traps, pound nets, set nets and setlines as fixed appliances, and classifies seines, gill-nets and dip-nets separately therefrom. The short ballot title was defective in that it prohibited salmon fishing only, as did the legislative title and the heading contained on the initiative petition. The failure to include in the legislative title steelhead and salmon trout and the various types of fishing gear referred to in the bill was confusing to the voters and violative of Art. IV, section 20 of the Oregon Constitution. The word "salmon" cannot include steelhead and salmon trout, and section 36, chapter 105, General Laws of Oregon, 1921, being section 83-408 [should be 83-303], O. C. L. A., which defines salmon as including "chinook, silversides, steelheads, bluebacks, sockeye, and all anadromous species of salmon and trout," except steelheads in the Rogue River, is void, so far "as it might effect [affect] this initiative measure", in the following particulars:

(1) The legislative title of such chapter 105 does not include any statement showing an intention to define salmon, or to define steelheads and all anadromous species of salmon and trout as salmon; and steelheads and salmon trout and other anadromous trout are not salmon, and are not understood to be salmon by the general public and the voters of the state.

(2) The legislature was without power to make steelheads, salmon trout and all anadromous trout into salmon by legislative definition.

(3) Said section so defining salmon was a part of a new complete fish code adopted by the legislature in 1921; and said chapter 105 contains 171 sections, and section 36 thereof must be construed as a definition pertaining to that act alone or acts directly amendatory thereto, and not to a separate act or acts subsequently passed, and particularly by initiative petition.

There are five distinct types of salmon indigenous to the North Pacific Ocean and subject to commercial fishing, to wit, chinook or King salmon, blueback or sockeye, silverside or coho, chum or dog salmon, and pink or humpback salmon. Of these, said statute includes only three, to wit, chinook or King salmon, blueback or sockeye salmon and silverside or coho salmon, and omits chum or dog salmon and pink or humpback salmon. The statute sets out the blueback and sockeye as separate types, when, as a matter of fact, they are identical. The steelheads and salmon trout are distinct members of the trout family and are undersood to be such by persons connected with fish life and commerce.

The Columbia River Fishermen's Protective Union is an Oregon corporation, having its membership limited to licensed gill-net fishermen. One of its principal purposes is to monopolize and control the catching of salmon and other food fishes on the Columbia River. Said union and its membership and those affiliated with it have undertaken, agreed and conspired with each other to eliminate all other types of commercial fishing for food fish on the Columbia River in order to secure to themselves a monopolistic control of the fish industry on said river. The gill-net catch is practically all made by members of said

union, and the total thereof is a very large part of the total catch of all food fishes of the river. The catch of food fishes, by the gear described as "bag net" or "dip net" in the reports, is practically all the result of fishing by Indians, who are exempted from the operation of the initiated measure. The fish reported as troll fish are caught in the ocean and delivered in Oregon.

The 1940 catch of food fish by gill-net and all other types of licensed gear is illustrative and typical and is as follows: Chinook salmon, steelhead trout, blueback salmon, silverside salmon, chum salmon, white and green sturgeon and shad 7,910,657 pounds by gill-net out of a grand total of 14,613,178.

It is impossible to fish for sturgeon or shad with seines without catching chinook, blueback, silverside, chum salmon and steelhead trout, and if plaintiffs, with their drag seines, fish for shad, sturgeon or other types of food fish, they will inevitably catch salmon and steelhead trout also. Thus, plaintiffs, who are duly licensed by the state of Oregon to fish with drag seines, cannot fish under their licenses without catching the prohibited types of salmon and steelhead trout and salmon trout.

J. Henry Niemela, Charles F. Henne, and Columbia River Fishermen's Protective Union and its members, initiated said measure for the sole purpose of driving plaintiffs out of their lawful business and denying them the right to fish under the terms of their licenses. By said initiative measure said sponsors, cooperating and conspiring with said fishermen's union, attempted to deny to plaintiffs the equal protection of the law guaranteed to plaintiffs by the Constitution of the United States and the Constitution of the state

of Oregon. In order to secure to said gill-net fisher-men a complete monopoly in the taking of food fishes on the Columbia River, the sponsors initiated said measure and secured its passage, and further to effect this purpose, and to confuse, mislead and prejudice the voters, they conducted, prior to the election, a campaign of spreading false, malicious and untrue statements concerning the effect of the use of fixed fishing appliances sought to be prohibited by said initiative bill. In such campaign they used the bill-board, the printed word, including the official voters' pamphlet, the air, and word of mouth. As examples of such untruths, the following are cited:

(a) A billboard showing a picture in color of a beautiful chinook salmon, ensnared by the throat within the jaws of a cruel steel bear trap smirched with the blood of its victim.

(b) The same picture was circulated by pamphlet, "embellished by the printed words, to wit, remove murderous fish traps and seines to prevent wholesale slaughter of trout and steelhead." All fish captured by fish traps or seines are alive and can be easily released to live throughout their natural lives, and the contrary is true as to fish captured by gill-nets.

(c) That the use of seines and other fixed gear will destroy the fishing industry. This is untrue.

(d) That the bill was a conservation measure. This is untrue, and has been so reported by the Commission.

The sponsors of the initiative measure failed to file, in accordance with section 81-2412, O. C. L. A., at the time of filing their completed petition, a duly verified statement showing the contributions and expenditures. The statement which they did file, a copy of which is exhibited, was not a compliance with the

section of the code above mentioned; no vouchers whatever were filed substantiating said statement; and the purposes for which the funds were stated to have been spent are so general as to serve no purpose whatever within the intent of the law.

Chapter 3, Oregon Laws 1949, is unconstitutional in that it contravenes the 14th Amendment of the Constitution of the United States, by depriving plaintiffs of their property without due process of law, and by depriving them of the right to earn their livelihood by their ordinary and usual occupation; in that it contravenes Art. I, section 18, Constitution of Oregon, by taking plaintiffs' property without just compensation; in that it contravenes Art. I, section 20, Constitution of Oregon, by granting a special privilege or monopoly to a certain class of citizen, to wit, gill-net fishermen, thereby unreasonably depriving plaintiffs of their equal rights to fish in the waters of the Columbia River and its tributaries in Oregon; and in that it exempts from its operation a certain class of citizens, to wit, Indians, under a federal regulation and grants to them a privilege and immunity that is not granted equally to other citizens of the state of Oregon and of the United States of America, contrary to the 14th Amendment of the Constitution of the United States of America and Art. I, section 20, Constitution of Oregon. In this respect it is alleged that the Quinault, Klamath and Umatilla Indians, together with many other Indian tribes, all of which had fished on the Columbia River in Oregon and Washington long prior to the formation of the United States of America, have executed treaties with the United States, by which treaties, *"the exclusive right of taking fish in the streams running through and bordering their re-*

spective reservations is secured to the Indians in their respective reservations, as well as the right to fish at all other usual and accustomed places in common with citizens of the United States." Said treaties are the basis of fishing rights granted to the Indians and are the regulations governing their rights. The "territory locally known as Snag Island, Oregon Island No. 1 and No. 2, and Brown's Island, all in the Columbia River in Oregon, are usual and accustomed places where the Indians have fished ever since the memory of man runneth not to the contrary." Other such usual and accustomed places are upon the Columbia River between Hood River and The Dalles, Oregon. All of said places are not within any Indian reservation, but are places where the Indians through said treaties are vested with the right of fishing in common with citizens of Oregon. The islands above mentioned and many other places within the territory above named are suitable places at which seines can profitably be operated. There is no federal regulation or treaty limiting the Indians to the use of any particular fishing gear, nor is there any federal regulation or treaty prohibiting them from using any type of fishing gear. The initiative act provides that it does not apply to Indians fishing under federal regulation. The act thereby grants the Indians a right to fish in the usual and accustomed places with seines, a right denied to other citizens of this state, in violation of Art. I, section 20, Oregon Constitution, and of the 14th Amendment of the Constitution of the United States of America.

Section 81-2107, O. C. L. A., provides that measures proposed by initiative petition shall be designated and distinguished on the ballot by the heading, "pro-

posed by initiative petition''. On the official ballot which was presented to the voters in the initiative election in question, there was written, ''Proposed by Initiative Petition,'' not *petitions,* and under such heading appeared six several initiative measures; and, upon the official ballot for Clatsop, Crook, Wasco, Coos, Sherman, Yamhill, Tillamook, Jackson, Gilliam, Josephine, Klamath, Harney, Lane and Morrow Counties the initiative measure under discussion herein appeared in a separate column and not under the required statutory heading.

If plaintiffs do not exercise their rights under ''their perpetual license from the State of Oregon'', the same will be forfeited and plaintiffs will be debarred of their rights to their properties and the use thereof and the large profit therefrom, and will be ''prevented from following their usual vocation in perpetuity'' as they are now entitled to do so long as they comply with the laws of the state; and, unless enjoined from so doing, the defendants will cause many prosecutions and actions at law to be commenced against plaintiffs, to plaintiffs' great and irreparable loss, injury and damage.

The Commission and the gill-netters separately demurred to the amended complaint on the ground that it did not state facts sufficient to constitute a cause of suit or to entitle plaintiffs to the relief prayed for. Both demurrers were overruled by the trial court, and, the demurrants having refused to plead further, the court, on November 15, 1949, entered a decree, holding and declaring that the act was unconstitutional in the respects set forth in the amended complaint, and enjoining and restraining the Commission from enforcing it and the gill-netters from interfering in

any manner with the fishing operations of plaintiffs. From this decree, the Commission and the gill-netters have prosecuted separate appeals, assigning as error the overruling of their respective demurrers.

The Commission summarizes succinctly the grounds upon which the amended complaint challenges the constitutionality of the act, as follows:

(1) It contravenes the Fourteenth Amendment of the United States Constitution, by depriving plaintiffs of their property without due process of law, and Article I, section 18, Oregon Constitution, by taking plaintiffs' property without just compensation.

(2) It contravenes Article I, section 20, Oregon Constitution, by granting a special privilege and monopoly to gill-net fishermen.

(3) It contravenes the Fourteenth Amendment of the United States Constitution and Article I, section 20, Oregon Constitution, by granting a special privilege to Indians fishing under federal regulations.

(4) It violates Article IV, section 20, Oregon Constitution, in that the body of the act went beyond the scope of its legislative title, the short ballot title was defective, and the general ballot title was confusing and misleading.

(5) The ballot title and general title were confusing and misleading, in that they included whip seines and fish wheels, which were already prohibited by other laws.

(6) The sponsors of the initiative measure failed to file a proper financial statement.

(7) The motive of the sponsors was to create a monopoly and deprive plaintiffs of their livelihood.

(8) The official ballot title presented to the voters contained the word "petition" and not "petitions",

and therefore did not comply with the provisions of section 81-2107, O. C. L. A.

The constitutionality of the act was sustained by this court in the case of *Anthony et al. v. Veatch et al.,* 189 Or. 462, as against all of the grounds of purported unconstitutionality mentioned above, except those numbered (6) and (8). We refer to our opinion in that case, and, *mutatis mutandis,* adopt it, *pro tanto,* for the case at bar. We shall confine our discussion hereunder, therefore, to matters which either were not presented at all in *Anthony v. Veatch,* or have been presented differently herein.

The seiners concede that the state, in the exercise of its sovereign power, has the right to control and regulate fishing. Moreover, they do not controvert the propositions that the state may lawfully regulate the taking of salmon in waters over which it has concurrent jurisdiction with the state of Washington; that the renewal of a commercial fishing license does not give the licensee a right to fish in such waters paramount to the right to fish that is common to all citizens; and that riparian owners upon a navigable body of water have no priority or exclusive rights of fishing therein.

■ It is contended that a drag seine is not, in fact, a fixed fishing appliance, and that it cannot be made such by legislative fiat. It is true that Mr. Justice HARRIS, in *Monroe v. Withycombe,* 84 Or. 328, 331, 165 P. 227, classified both gill-nets and seines as floating gear, but, as pointed out in *Anthony v. Veatch,* supra, the Commission has classified drag seines as fixed gear. It has statutory authority to do so, and its classification is final. Section 83-213, O. C. L. A.; *Smith v. McGowan,* 131 Or. 522, 533, 284 P. 189. More-

over, there is plausible justification for such classification, as a drag seine may be used only upon a specific seining ground, as described in the license under which it is operated. Section 83-408, O. C. L. A., as amended by Ch. 189, Oregon Laws 1947; Section 83-605, O. C. L. A., as amended by Ch. 34, Oregon Laws 1947. The fact that former legislation tended to classify seines and gill-nets together as floating gear is immaterial.

■■ The people of Oregon, in the exercise of their reserved legislative power in the adoption of this initiative act, gave expression to their belief that the operation of the drag seine is peculiarly destructive of salmon and other anadromous fish of the salmon family. Whether or not they were correct in this belief, and whether or not the legislation in this respect was wise, are legislative questions. As a rule, the determination of the necessity and reasonableness of regulatory statutes of this character is left to the discretion of the legislative body, whose determination, unless manifestly unsound, is binding upon the courts. *Union Fishermen's Co. v. Shoemaker,* 98 Or. 659, 680, 193 P. 476, 194 P. 854; *Tuttle v. Wood,* (Tex. Civ. App.) 35 S. W. 2d 1061, 1063; *Thomson v. Dana,* D.C. Or., 52 F. 2d 759, 763.

■ It is suggested that the fact that the drag seine is not a fixed fishing appliance is established, for the purposes of the present discussion, by the allegations of the amended complaint to that effect. But such allegations are merely the conclusions of the pleader, and raise no issue. *Rayburn v. Crawford,* 187 Or. 386, 393, 211 P. 2d 483.

A considerable portion of the brief filed on behalf of the seiners is devoted to an interesting discussion

of the various treaties which were entered into between the United States and various Indian tribes, in which treaties, among other matters, there was reserved to the Indians the exclusive right of taking fish in the streams running through and bordering their reservations, and, in common with other citizens, a right of fishing at all other usual and accustomed places. It is argued that the rights reserved by the Indians under one of such treaties, namely, that entered into with the Middle Oregon Tribes in 1865, were voluntarily abandoned or surrendered by the Indians by a subsequent treaty, ratified March 2, 1867. It is contended further that the Indian treaties in question are not binding upon Oregon, because they were not ratified by the United States Senate until after the admission of Oregon into the Union. The obligatory effect of these treaties upon the State of Oregon was fully discussed in *Anthony v. Veatch,* supra. Moreover, the whole argument is directly contradictory of the allegations of the amended complaint respecting the Indian treaties, as set forth in the preamble of this opinion.

In *Anthony v. Veatch,* supra, we referred to section 36, chapter 105, General Laws of Oregon, 1921, codified as section 83-303, O. C. L. A., which reads as follows: .

"Wherever the word 'salmon' is used in any of the laws of Oregon, the same shall be deemed and held to include chinook, silversides, steelheads, blueback, sockeye and all anadromous species of salmon and trout, except as to steelheads in the waters of the Rogue River, where the said steelheads are classified as game fish."

■ Under the rule of *ejusdem generis,* a general phrase in a statute immediately following the enumera-

tion of particular persons or things is applicable only to other persons or things of the same kind, class or nature. Note, Ann. Cas. 1914 C 305; 50 Am. Jur., Statutes, Sec. 249; *Hise v. City of North Bend,* 138 Or. 150, 157, 6 P. 2d 30. Applying the rule, it is contended that the phrase, "and all anadromous species of salmon and trout", adds nothing to the particular types of salmon named in the section.

■■ The rule of *ejusdem generis,* however, is not one of universal application. There are cases in which the courts refuse to apply it, and in which, despite the rule, they give to a general phrase in a statute a meaning beyond the specific term or terms which preceded it. 50 Am. Jur., Statutes, Sec. 250. By the use of the phrase, "and all anadromous species of salmon and trout", the legislature undoubtedly intended to include within the definition of "salmon" all species of salmon and trout which ascend rivers to spawn. It seems evident that the legislature intended that the rule of *ejusdem generis* should not be applied to "and all anadromous species of salmon and trout", as that phrase, by its own terms, was, it would seem, deliberately intended to extend the significance of the word "salmon" beyond its ordinary import. *Fisher v. City of Astoria,* 126 Or. 268, 282, 269 P. 853, 60 A. L. R. 260; *Kaiser v. Idleman,* 57 Or. 224, 229, 108 P. 193, 28 L. R. A., N. S. 169; *Horsfall v. Logan,* 72 Or. 150, 152, 142 P. 760. Moreover, we think that a strict application of the rule in this instance would result in a failure to give any effect whatever to the phrase in question, which was one that the legislature obviously intended to have meaning, and into which it is our duty to read an appropriate meaning, if that be possible. *Children's Bootery v. Sutker,* 91 Fla. 60, 107 So. 345, 44 A. L. R. 698, 701.

Again invoking the rule of *ejusdem generis,* the seiners argue that the words "or any fixed appliances", in section 2 of the act, add nothing to the specific appliances named therein, viz., "pound net, fish trap, fish wheel, scow fish wheel, setnet, or weir," and should be interpreted to mean only fishing appliances of a similar type to those so named. We take it that what they mean is that the phrase, "or any fixed appliances", does not include drag seines. But the petitioners' title of the act (in the amended complaint erroneously referred to as the "legislative" title) specifically mentioned drag and whip seines among the banned gear, along with "fish traps and other fixed fishing appliances", and, whatever may be the proper construction of section 2, which prohibits the use of pound nets, fish traps, fish wheels, scow fish wheels, setnets, and weirs, "or any fixed appliances", section 1 expressly prohibits the use of drag seines and section 3 the use of whip seines.

The proposition is advanced that the title of the act is insufficient and does not meet the requirements of Art. IV, section 20, Oregon Constitution. That section reads:

> "Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

The petitioners' title of the initiative bill was as follows:

> "A bill for an act prohibiting the taking of salmon by the use of drag and whip seines, fish traps and other fixed fishing appliances, in the waters

of the Columbia River and its tributaries, and providing penalties for violation thereof."

It is maintained that by such title the proposed legislation was limited to the subject of the taking of salmon, meaning "chinook, silversides, steelheads, blueback, sockeye", as the word "salmon" is defined by section 83-303, O. C. L. A., whereas, in the body of the act, the prohibition includes not only salmon, but also salmon trout and steelhead.

██ We think it is clear that the principal object of the act was the prohibition of the taking of salmon, and other anadromous fish of the same genus, by means of fixed appliances. The absolute prohibition of the use of seines was one of the means adopted by the people in putting into effect such principal object, and, although that absolute prohibition is not specifically mentioned in the title, the title is not for that reason violative of the constitutional provision. 59 C. J., Statutes, Sec. 394.

> "* * * when an act of the Legislature expresses in its *title* the object of the act, the title embraces and expresses any lawful means to achieve the object, thus fulfilling the constitutional injunction, that every law shall embrace but one object, and that shall be expressed in its title." City of San Antonio v. Lane, 32 Tex. 405, 412.

██ The act may lawfully include whatever provisions are incidental to or in any reasonable sense will promote the general purposes indicated in the title. *Sutherland, Statutory Construction,* 3rd ed., Vol. 1, Sec. 1707; *Evans v. Superior Court,* 215 Cal. 58, 8 P. 2d 467; *People v. Superior Court of San Bernardino County,* 10 Cal. 2d 288, 73 P. 2d 1221. Cf. *Lovejoy v. Portland,* 95 Or. 459, 466-467, 188 P. 207.

While it is true that section 1 merely makes it unlawful to maintain or operate any drag seine in the waters of the Columbia River or its tributaries in Oregon, without adding, specifically, "for the purpose of taking salmon, salmon trout or steelhead", or words to that effect, and section 3, in similar terms, merely prohibits the use of any whip seine in said waters, nevertheless, we think it is obvious that those sections should be construed as being germane to the subject of the act. They are naturally connected therewith, and are not in any respect foreign thereto. That being so, they are not violative of the constitutional provision. *Lovejoy v. Portland,* supra; *Pacific Elevator Co. v. Portland,* 65 Or. 349, 385, 133 P. 72, 46 L. R. A., N.S., 363; *In re Willow Creek,* 74 Or. 592, 615, 144 P. 505, 146 P. 475; *Nickerson v. Mecklem,* 169 Or. 270, 275, 126 P. 2d 1095.

■ There is a presumption that every legislative act is constitutional, and, before a statute is held to be void on the ground that its subject is not sufficiently expressed in the title, the conflict between the statute and the constitution should be palpable and totally irreconcilable. *Lovejoy v. Portland,* supra.

■■ It has been well said that the constitutional provision "was not imposed to hamper or impede the legislative process", nor "designed as a loophole of escape from, or a means for the destruction of legitimate enactments." Sutherland, *op. cit.,* Sec. 1702. One of its principal objects was "to prevent the combining of incongruous matters and objects totally distinct and having no connection nor relation with each other in one and the same bill". *Northern Counties Trust v. Sears,* 30 Or. 388, 400, 41 P. 931, 35 L. R. A. 188; *Lovejoy v. Portland,* supra.

We are of the opinion that the petitioners' title, as amplified by the ballot title provided by the attorney general, gave reasonable notice of, and was a fair index of, the general purposes of the proposed legislation, and that the terms of the act were within its subject as expressed in the title. Giving to the act every intendment in favor of its constitutionality to which it is entitled, we hold that it is constitutional and valid as against the objection that the title was insufficient. *Corvallis & Eastern R. Co. v. Benson,* 61 Or. 359, 369, 121 P. 418, Error dism., 235 U. S. 691, 59 L. ed. 428, 35 Sup. Ct. 206.

We are told that the act is void for the reason that its sponsors failed to file with the initiative petition a statement of moneys received and expended in the circulation thereof. Sec. 81-2412, O. C. L. A. It is argued that, because of such failure, the secretary of state was without power to place the measure upon the official ballot. There is attached to the amended complaint, as an exhibit, a statement of contributions and expenditures actually filed on behalf of the sponsors. It is contended that a reading of such statement will readily demonstrate that it was useless for any practical purpose. For example, it recited that there was paid to Chas. F. Henne, for "personal services", $2,100.00, and for "traveling and miscellaneous expenses", $2,012.36; and to Henry Niemela, for "traveling and miscellaneous expenses", $1,231.56. These items of expenditure are not sufficiently detailed to meet the requirements of law.

■ The question is, how much weight is to be given to a complaint of this sort, when it is put forward subsequent to the election? Cf. *State ex rel. McPherson v. Snell,* 168 Or. 153, 121 P. 2d 930. The

failure of the sponsors to file a sufficient statement of expenditures did not prevent the electors from giving a full, fair, and honest expression of the popular will at the election. The initiative petition was approved by a vote of 273,140 to 184,834. No doubt it would have been proper for the secretary of state, because of the failure of the sponsors of the measure to file a proper statement of their expenditures, to have refused to place the initiative petition upon the ballot. But this court should not in effect disfranchise 273,140 voters because of the failure of an officer to comply with technical requirements of the law, when it is not claimed that such failure had any effect upon the result of the election. 28 Am. Jur., Initiative, Referendum, and Recall, Sec. 17, text and footnote 9; *Kiernan v. Portland,* 57 Or. 454, 461, 111 P. 379, 112 P. 402; *Howell v. Bain,* 176 Or. 187, 199, 156 P. 2d 576.

It was alleged in the amended complaint that, on the official ballots in fourteen counties of the state, there was a heading, "Proposed by Initiative Petition", under which heading were printed the ballots for a constitutional amendment fixing the qualifications of voters in school elections and five other measures, and that, in a separate column and not under the above heading, there was printed the ballot for the initiative measure under discussion herein. The law imposes upon the several county clerks the duty of so printing the ballots that measures proposed by initiative petition shall be designated and distinguished thereon by the heading, "Proposed by Initiative Petition". Sec. 81-2107, O. C. L. A., as amended by Chap. 55, Oregon Laws 1949. It is argued that the purpose of the law was to provide the voters with knowledge of the fact that the measure was submitted on an initiative

petition, and that, as this particular measure did not bear the required heading, the election was invalid and the act is void.

*Kiernan v. Portland,* supra, had to do with the validity of a special election upon a proposed amendment to the charter of the City of Portland, making provision for the construction of a bridge across the Willamette River and for the issuance of bonds to defray the expense of such construction. It was contended by the plaintiff, among other things, that the failure of the city auditor to have the words "Charter Amendment submitted by the Council" printed upon the election ballot, as required by city ordinance, rendered the election void. In repelling such contention, this court said:

"Plaintiff also contends that the failure of the auditor to have the words 'charter amendment submitted by the council' printed upon the ballot rendered the election void. It may be conceded that these words should have been printed upon the ballot, and that the ordinance requiring this to be done is in a sense mandatory upon the officers charged with the duty of preparing the ballot; but it does not follow that a failure in this respect renders the election void. The omission could have misled nobody, as the important question for the voter to decide was not who introduced the measure, but what its real merits were. Courts should hesitate to disfranchise 10,000 voters because of the neglect of an officer to comply with a technical and comparatively unimportant provision of the law, unless it can be seen that the effect of such negligence might have been to change the result of the election. Following the doctrine above announced, courts have frequently held statutes, containing provisions similar to the one invoked by plaintiff in this case, to be merely directory as to the voter:

Jones v. State, 153 Ind. 440, 55 N. E. 229; Patton v. Watkins, 131 Ala. 387, 31 S. 93, 90 Am. St. Rep. 43; Maxwell, Int. Stat. 556, 557.''

 The initiative powers were reserved to themselves by the people of Oregon by Art. IV, section 1, Oregon Constitution. This section of the constitution is self-executing. *Stevens v. Benson,* 50 Or. 269, 275, 91 P. 577. That being so, it was unnecessary for the legislature to have prescribed a mode for the exercise of such powers. *Stevens v. Benson,* supra (50 Or. 269, 274, 275, 91 P. 577). It has done so, however, in sections 81-2001 et seq., O. C. L. A., and the supplementary legislation is obligatory upon the court, if the legislature intended it to be mandatory. There is no express declaration in the statute that the omission of the statutory heading upon an initiative ballot will render the election void. If the question had been raised before the election, the trend of authority indicates that the statutory requirement should have been considered as mandatory. *State ex rel. McHenry v. Mack,* 134 Or. 67, 73, 292 P. 306. As it was not raised until after the election, and as no charge of fraud has been made, or even suggested, we are disposed to construe the statute liberally, and, under the circumstances, to hold that the requirement was directory only. The ballot title and the measure itself so clearly informed the voters of the nature and description of the proposed act, that the nonobservance of the statutory requirement as to the ballot heading by some of the county clerks cannot be said to have prevented a free and intelligent expression of the will of the electorate. Sutherland, Statutory Construction, 3rd ed., Vol. III, § 5820; 28 Am. Jur., Initiative, Referendum, and Recall, Sec. 17, text and note 9; *Kiernan v. Portland,* supra; *State ex rel. McHenry v. Mack,*

supra; *State ex rel. Harry v. Ice,* 207 Ind. 65, 191 N. E. 155, 92 A. L. R. 1508, 1512.

We are of the opinion that the amended complaint herein failed to state a cause of action under the declaratory judgments law, and that the demurrers of the Commission and of the gill-netters thereto should have been sustained.

The decree is reversed and the cause remanded for such further proceedings as may not be inconsistent with this opinion. No party shall recover costs on this appeal.

ON PETITION FOR REHEARING

*A. C. Fulton,* of Astoria, and *Jay Bowerman,* of Portland, for the petition.

*George Neuner,* Attorney General of Oregon, and *Cecil H. Quesseth,* Assistant Attorney General, both of Salem, for appellants, contra.

*Anderson & Franklin,* of Portland, for intervenors-appellants, contra.

Before LUSK, Chief Justice, and BRAND, BELT,* ROSSMAN, HAY, and LATOURETTE, Justices.

HAY, J.

The respondents have petitioned for a rehearing, and have supported their petition by brief.

█ Their principal contention is that we erred in holding that we are bound to interpret the initiative act in conformity with treaties which were entered into between the United States and certain Indian "nations". (See our opinion in *Anthony v. Veatch,* June 30, 1950,

---
* Died August 6, 1950.

which opinion, *pro tanto*, we adopted for the case at bar.) Respondents say that some of these treaties are no longer effective, having been abrogated by the high contracting parties. Moreover, they argue that, although the treaties were signed while Oregon was a territory, none of them were ratified by the President and Senate of the United States until after the date of the state's admission into the Union, all of them contained clauses deferring their obligatory effect until ratification by the President and Senate, and, therefore, ratification did not cause them to relate back to the respective dates of their signing. They maintain, further, that ratification of the treaties subsequent to the admission of Oregon into the Union did not make them effective as against intervening private rights.

■ The amended complaint recited the making of the Indian treaties, and alleged that such treaties "secured" to the Indians the right, in common with citizens of the United States, to fish on the Columbia River, without the Indian reservations, at all usual and accustomed places. It did not even suggest that any of the treaties had been abrogated, or modified, or was in any respect invalid. Upon this phase of the case, it sought to have the initiative act declared unconstitutional on the ground that, by exempting from its operation Indians fishing under federal regulation, it gave them, in their usual and accustomed fishing places, a right to fish with seines, which right it denied to citizens of the state.

The exemption of Indians fishing under federal regulation, that is to say, Indians fishing under rights reserved to them by the treaties (*United States v. Winans*, 198 U. S. 371, 49 L. ed. 1089, 1092, 25 Sup. Ct. 662), did not "give" the Indians any rights whatever. It

simply recognized whatever fishing rights, as confirmed by the treaties, the Indians may have. Respondents, both in the amended complaint and on brief, concede that the Indians do have some rights in the premises. In that connection, we are concerned only with the allegation that the initiative act gave the Indians a right which it denied to other citizens. Palpably, it did not do so.

It is suggested that we erred in treating the cause as one for a declaratory judgment. Respondents say that it was actually brought under the statute relative to injunctions, §§ 9-401 et seq., O. C. L. A., for the purpose of procuring an injunction to prevent threatened injury to their property and property rights. Even if that were so, the relief sought involved an adjudication that the initiative act was unconstitutional, and, therefore, was declaratory in character. 16 Am. Jur., Declaratory Judgments, § 3. The amended complaint might have been based upon either the uniform declaratory judgments act (§§ 6-601 to 6-616, O. C. L. A.) or the injunction statute. We construed it as being based upon the former, by reason of the fact that it prayed for a decree "declaring said initiative act * * * null and void in its entirety". We were of the opinion that such a prayer indicated that the pleaders conceived that they had made a case for a declaratory decree. 41 Am. Jur., Pleading, § 110. In any event, under either form of suit, the amended complaint was equally vulnerable to general demurrer.

Respondents express the fear that our condensation of the allegations of the amended complaint may "occasion some future misunderstanding as to the title of" plaintiffs, Columbia River Packers Association, a corporation, and H. K. Parker, in "such of these

shorelands or tidelands or islands as they might actually own, thereby creating a cloud, based upon a misunderstanding of the facts.'' We think that the fear is groundless. Our condensation of what, according to our interpretation, the amended complaint alleged, was not in any sense intended as an adjudication of title to any property, whether land or chattels.

The petition contains other alleged errors, and we have considered such, but find no error therein nor any need for further discussion.

The petition for rehearing is denied.

In our opinion, we stated that the cause would be remanded for such further proceedings as might not be inconsistent therewith. On further consideration, it appears to us that a remand in such terms would be too indefinite. Our view was that the cause should be dismissed, and it will be remanded with directions to that effect.