Argued on demurrer to alternative writ July 16, demurrer overruled July 30, 1926.

## JOSEPHINE M. OTHUS v. SAM A. KOZER, SECRETARY OF STATE.

(248 Pac. 146.)

Statutes—Vote Cast for Attorney General cannot be Taken as Basis in Estimating Number of Signatures Required to have Initiative Measure Placed on Ballot (Const., Art. IV, § 1).

1. Vote cast for Attorney General cannot be taken as basis in estimating number of signatures required to have initiative measure placed on ballot, in view of Constitution, Article 4, Section 1, providing that "whole number of votes cast for justice of the Supreme Court" at last election shall be basis.

**Statutes.**

2. When act has doubtful or ambiguous meaning, court must adopt construction which will make it operative and carry out intention as far as possible.

**Statutes—Reasonable Construction of Statute will be Adopted, Rather Than Absurd Construction.**

3. Where language of legislative act admits of two constructions, one absurd and one reasonable, courts will adopt latter.

**Constitutional Law—In Determining Number of Signatures Required to have Initiative Measure Placed on Ballot, Court will Consider Contemporaneous Construction of Constitutional Provision by Administrative Officers (Const., Art. IV, § 1).**

4. In determining number of signatures required to have initiative measure placed on ballot, under Constitution, Article IV, Section 1, which is of doubtful meaning, court may properly consider contemporaneous construction given such provision by administrative officers.

**Statutes.**

5. Election laws should be liberally construed.

**Constitutional Law.**

6. In construing Constitution, Article IV, Section 1, providing for initiative, any doubt should be resolved in favor of exercise of such right.

**Statutes.**

7. Eight per cent of greatest number of votes any candidate receives for justice of Supreme Court at regular election last preceding *held* proper basis for ascertaining number of signatures required on initiative petition, under Constitution, Article IV, Section 1.

---

Constitutional Law, 12 **C. J.**, p. 700, n. 74, p. 712, n. 73, p. 788, n. 97, p. 1.
Elections, 20 **C. J.**, p. 62, n. 46, p. 169, n. 54.
Mandamus, 38 **C. J.**, p. 666, n. 53.
Statutes, 36 **Cyc.**, p. 942, n. 24 New, p. 1106, n. 29, p. 1107, **n. 34,** 36, p. 1108, n. 39, 40, p. 1111, n. 69, 71, p. 1140, n. 64.

Original proceeding in *mandamus.*

DEMURRER OVERRULED.

For plaintiffs, *Mr. Elton Watkins* and *Mr. W. E. Richardson.*

---

2. See 25 **R. C. L.** 1008.
3. See 25 **R. C. L.** 1018.
4. See 6 **R. C. L.** 63.

For defendant, *Mr. I. H. Van Winkle*, Attorney General, and *Mr. W. S. U'Ren* and *Mr. Oswald West.*

BELT, J.—This is an original proceeding in *mandamus* to compel the Secretary of State to accept and file an initiative petition for the purpose of submitting a certain measure to be voted upon by the people of Oregon at the next general election in November. The sole question involved is the number of signatures required in order to have placed upon the ballot an initiative measure. If the petition was not legally sufficient as to the number of signatures' thereto, the Secretary of State was right in refusing to accept and file the same; but if it had the requisite number of names, then the writ must issue.

It appears from the alternative writ, to which a demurrer has been interposed, that the petition was signed by 13,773 registered voters of the state. The defendant, upon advice of the Attorney General, rejected the petition for the reason that it is not legally sufficient as to number of signatures.

The decision hinges upon the construction of that part of Article IV, Section 1, of the Constitution of Oregon which provides:

"The first power reserved by the people is the initiative, and not more than eight per cent of the legal voters shall be required to propose any measure by such petition, * * The whole number of votes cast for justice of the supreme court at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted."

In the regular election in November, 1924, there were two justices of the Supreme Court to elect and the names of three candidates appeared upon the ballot. Each voter had the right to vote for two of the three candidates, but an analysis of the vote cast discloses that not every voter exercised such right. Some voted for only one candidate. A received 159,490 votes; B, 107,734; and C, 96,513. The total vote cast for all the candidates was 363,737.

1. Plaintiff contends that 12,760 signatures of legal voters of the state upon a petition—which is 8 per cent of the votes cast for A—is sufficient in order to submit an initiative measure to a vote of the people. Defendant asserts that this is not the proper basis for computation. Shall we take as a basis for determining the number of signatures necessary for an initiative petition 8 per cent of the greatest number of votes any candidate received? Shall we take 8 per cent of the total vote cast for all of the candidates? Is the proper basis, as suggested by the Attorney General, 8 per cent of the total vote cast for all of the candidates, divided by the number to be elected? These are the questions which are of concern to the court. We are not impressed with the suggestion made by Mr. U'Ren in oral argument that the vote for Attorney General be taken as a basis, as such is wholly at variance with the plain mandate of the Constitution. We must look to the vote for justice of the Supreme Court.

In considering the above act it is important to bear in mind that the construction given must be such as will not violate the plain and explicit provision that "not more than 8 per cent of the legal voters of the state shall be required to propose any measure by such petition." Eight per cent of the

total vote for all candidates is 29,100. Assume that there were six candidates and that 8 per cent of their total vote exceeded 8 per cent of the legal voters of the state. In such event there would be a direct conflict between these two provisions of the Constitution. Under this construction the method provided to determine the proper basis would lead to an absurdity. In 1914, the total vote for justices of the Supreme Court was 701,846; in 1918, 225,828; and in 1920, 694,468. Judging from the records of past elections, it is thus apparent that 8 per cent of the total vote for all candidates for justice of the Supreme Court generally exceeded 8 per cent of the legal voters of the state. It is not reasonable to assume that the framers of this act intended that the number of signatures required on an initiative petition should depend upon the number of justices of the Supreme Court to be elected. In other words, under this proposed construction, where, at the regular election next preceding, there are four to elect, it would require approximately four times as many signatures to submit a measure to a vote of the people as it does when there is only one officer to elect. We think that the primary object is to determine the number of voters who thus voted, rather than the number of votes cast.

Let us consider the method of computation as proposed by the Attorney General, i. e., to take 8 per cent of the total vote and divide that by the number of positions to be filled. In 1920, 694,468 votes were cast for justices of the Supreme Court. Eight per cent of this number divided by five, or the number of positions to be filled, is 11,112, or the number of signatures required on an initiative petition. In 1914, 701,846 votes were cast for justices of the

Supreme Court. Divide this number by three, or the number of officers to be elected, and the result is 105,374 more votes than any candidate received. In 1924, 363,741 votes were likewise cast. Eight per cent of this number divided by two, or the number of positions to be filled, is 14,550, or the number of signatures necessary to initiate a measure according to the contention of defendant. While this method of computation impresses us as fair, it is, in our opinion, not warranted by any possible construction of the language of the act, and is entirely an arbitrary standard. The fallacy of this argument, as applied to the instant case, is that not every voter exercised the right to vote for two justices of the Supreme Court. Many voted for only one candidate, as an analysis of the vote discloses.

The latter part of the act, which provides the method of ascertaining the number of signatures necessary on an initiative petition, is ambiguous and uncertain. It tends toward confusion rather than clarity. It is evident that there is no way of ascertaining with any degree of certainty the number of voters who voted for justice of the Supreme Court without opening the ballot-boxes and actually examining each ballot. This, of course, is highly impracticable, and not to be considered.

2. When an act has a doubtful or ambiguous meaning, it is the duty of the court to adopt that construction which will make it operative and to carry out, so far as possible, the intention of the people who enacted it: *Rathfon* v. *Payette-Oregon Slope Irr. Dist.,* 76 Or. 606 (149 Pac. 1044). As stated by Mr. Justice HARRIS, speaking for the court, in *Union Fishermen's Co.* v. *Shoemaker,* 98 Or. 659 (193 Pac. 476, 194 Pac. 854):

"In construing a statute, ascertainment of the intention of the legislature is the 'consummation devoutly to be wished'; and, if the words of the statute are not of themselves sufficiently explicit to manifest the intention of the lawmakers, the intention is then to be ascertained by considering the context, the subject matter, the necessity for the law, and the circumstances under which it was enacted, the mischief sought to be remedied, and the object to be attained; 25 R. C. L. 1012, 36 Cyc. 110. If, however, the intention of the legislature cannot be discovered, the court should give the statute a reasonable construction consistent with the general principles of law; 36 Cyc. 1108."

3. Furthermore, if the langauge of an act admits of two constructions, one absurd and mischievous, and the other reasonable and wholesome, courts will adopt the latter construction: *State* v. *Gates,* 104 Or. 112 (206 Pac. 863).

4. Under the circumstances, we think it proper to consider contemporaneous construction given this act by administrative officers. This principle was recognized in *Kelly* v. *Multnomah Co.,* 18 Or. 356 (22 Pac. 1110), wherein the court said:

"In all cases where those persons whose duty it is to execute a law have uniformly given it a particular construction, and that construction has been acquiesced in and acted upon for a long time, it is a contemporary exposition of the statute, which always commands the attention of the courts, and will be followed unless it clearly and manifestly appears to be wrong."

In *Brown* v. *United States,* 113 U. S. 568 (28 L. Ed. 1079, 5 Sup. Ct. Rep. 648, sec, also, Rose's U. S. Notes), a question arose as to the construction of an act of Congress providing for the retirement of "officers of the navy," and the court said:

"It must be conceded that, were the question a new one, the true construction of the section would be open to doubt. But the findings of the Court of Claims show that soon after the enactment of the act the President and the Navy Department construed the section to include warrant as well as commissioned officers, and that they have since that time uniformly adhered to that construction, and that under its provisions large numbers of warrant officers have been retired. This contemporaneous and uniform interpretation is entitled to weight in the construction of the law, and, in a case of doubt, ought to turn the scale."

In 1920, there were four candidates in one class on the ballot and four to elect. In a separate class on the same ballot there were three candidates and one to elect. Henry J. Bean received 165,752 or the greatest number of votes of any of the candidates. The Secretary of State used this vote as the basis for determining the necessary number of signatures on an initiative petition. While the precise question at bar was not involved, this construction was tacitly approved in *State ex rel. Carson* v. *Kozer,* 105 Or. 486 (210 Pac. 179), as the court stated:

"An initiative petition, to be sufficient, must bear the signatures of 13,261 legal voters."

It is significant that this number is 8 per cent of the Henry J. Bean vote. The administrative officer in the instance last mentioned did not take 8 per cent of the total vote cast nor did he divide 8 per cent of the total vote by the number of positions to be filled.

In 1922, there were three candidates for justice of the Supreme Court and three to elect. The same method of computation was followed by the Secretary of State and Geo. H. Burnett's vote of 168,724 was

taken as a basis. The total vote cast for all of the candidates was 487,885. Again this court adopted such construction in *Kellaher* v. *Kozer*, 112 Or. 149 (228 Pac. 1086). It was there said:

"To initiate this measure it was necessary, under the statute, that the petition should be filed not later than four months before the date of the election and that it should be signed by not less than 13,498 legal voters."

Eight per cent of the Burnett vote is 13,498.

5, 6. Election laws should be liberally construed: *State ex rel. Davis* v. *Wolf et al.*, 17 Or. 119 (20 Pac. 316); *State ex rel. Erickson* v. *Sanborn et al.*, 101 Or. 686 (201 Pac. 430). The great constitutional privilege of a citizen should not be taken away by a narrow or technical construction of a law regulating the exercise of such right. We have before us an act which is of doubtful construction. It would seem that the doubt should be resolved in favor of the exercise of the right of the people to initiate a law if they see fit so to do. We see no good reason to depart from the construction heretofore given this act by officers whose duty it is to administer it.

7. Eight per cent of the greatest number of votes any candidate receives for justice of the Supreme Court at the regular election last preceding is held to be a proper basis for ascertaining the necessary number of signatures of legal voters of the state upon an initiative petition. It is conceded that this construction is not free from criticism, as it is certain in 1924 A did not receive all of the votes cast for justice of the Supreme Court, but the basis selected will at least tend toward clarity and give operative effect to the law under consideration.

The demurrer to the alternative writ is overruled and a peremptory writ will issue.

DEMURRER OVERRULED.

BROWN and COSHOW, JJ., were absent.

RAND, J., did not participate in this decision.

BURNETT, J., Dissenting.—In this original proceeding in this court to compel the defendant by *mandamus* to file and place on the ballot at the coming election an initiative measure described in the alternative writ, so that the same may be voted upon at the next general election, the defendant filed a general demurrer to the alternative writ.

In keeping with the meticulous punctilio characterizing the whole referendum system and its appurtenant legislation, the writ goes into great detail in alleging the preliminary steps for procuring signatures to initiative bills, even to stating the quality of the paper and the size thereof upon which the petitions were printed. When it comes to the essential part of the question which was argued before us at the hearing of the demurrer, we find the following language:

"Whereas, it is further alleged that the petition for said initiative measure was duly signed in due and legal form by 18,100 citizens and legal voters of the State of Oregon, giving in addition to their signatures their residences, post offices and precinct numbers, and of which number 13,773 were registered voters of the State of Oregon, more than the percentage required for that purpose; that under the constitution and laws of the State of Oregon not more than 12,760 genuine signatures of legal voters of the State of Oregon are required to initiate a bill"; etc.

As a matter of pleading, this allegation is not sufficient in that it contains only a conclusion of law. The writ ought to state the facts which the plaintiff claims authorize the conclusion so that the court could for itself determine whether that conclusion was a proper one as a matter of law. This alone is sufficient to sustain the demurrer to the writ. The question argued at the hearing does not arise upon a fair consideration of the averments of the writ. Like any other case, the issue of law on the demurrer ought to be determined on the sufficiency of the averments of the writ.

In some of the briefs, but not in the writ, we find it stated that at the last general election, as shown by the abstract of the canvass of the votes for justice of the Supreme Court:

Harry H. Belt received 159,490 votes.
O. P. Coshow received 107,734 votes.
Percy R. Kelly received 96,513 votes.
Scattering received 4 votes.

In the present form of the state Constitution, in Section 1 of Article IV thereof, treating of the initiative and referendum, it is said:

" * * The first power reserved by the people is the initiative, and not more than 8 per cent of the legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. * * The whole number of votes cast for justice of the supreme court at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted. * * "

One of the most familiar rules of common-school mathematics is that in calculation of percentage there are two essential factors; first, the rate and, second,

the base, the product of which multiplied on each other is the percentage desired. By their Constitution the people have fixed 8 per cent as the rate. By the same authority they have said that the "whole number of votes cast for justice of the Supreme Court at the regular election last preceding the filing of any petition for the initiative" shall be the base. In that any other rate or base might have served the purpose as well, each of these factors is arbitrary, but necessarily so, if we are to employ the initiative system at all. As a matter of practical knowledge, there are no public records mathematically accurate concerning the actual number of voters in the state at any given date. It is an affair of general information that at every election there are legal voters who do not vote. It is also true that between elections many resident citizens reach the voting age, or die, so that the number of electors in the state, like the tide, is in a continual state of flux. It is fair to assume that no two enumerations of the legal voters of the state taken within a month of each other would agree exactly. Consequently, it became necessary to prescribe an arbitrary rule for the base upon which the percentage must be calculated. All standards are arbitrary.

It is well known that at every general election, from the creation of the separate Supreme Court to the present time, it is possible to have at least three places to fill as justices of the Supreme Court. The very first election after the establishment of the separate Supreme Court required the election of three separate justices of the court. Properly we may attribute to the authors of the amendment the idea that less of political enthusiasm or fanaticism would attend

an election of the justices of the Supreme Court than
for any other office. To the lasting credit of Oregon,
its Supreme Court has been singularly free of political
bias. Hence arose the theory that the vote on that
question would most fairly express the actual number
of votes when the people are calm and collected.
A natural consequence was the employment of the
number of votes cast for that office as the basis of the
percentage. The language of the Constitution in that
respect refers to votes and not to voters.

At every general election, each elector is entitled to
cast more than one vote. Possibly he votes for
United States senator, for Governor, for presidential
electors, or justices of the Supreme Court, and for
other officers. For Governor he casts but one vote but
for justices of the Supreme Court there might be a
possible seven for him to cast.

With all these matters of state history in mind, the
people enacted the Constitution, declaring not that
the number of voters who voted for justice of the
Supreme Court but the number of votes cast for that
office should be considered as the basis on which the
number of legal voters should be counted. Moreover,
they required not that the votes cast for any one
candidate but the whole number of votes cast for the
office should be that basis.

If we can, as a verity, say that the 159,490 votes
cast for B for justice of the Supreme Court at the
last general election were the only votes for that office,
then the *mandamus* ought to be made peremptory.
Again, if the 107,734 votes cast for C or the 96,513
votes cast for K were not votes cast for justice of the
Supreme Court, at least one member of this court
has no right to the office he holds. It is an absurdity

to say that the votes cast for C and for K were not votes cast for justice of the Supreme Court. They are quite as material in the calculation as any of the votes cast for B.

Take a possible case where there would be but one justice to elect and but two candidates, A and B. In a total vote of 200,000, A receives five more votes than B. Excluding the vote of B from the calculation and taking 8 per cent of the vote of A would result in government at the behest of an 8 per cent minority of a bare majority. The .evil would be accentuated if there were but one to elect; there were a half dozen candidates and the percentage was calculated on the highest vote of any single candidate, rejecting all the others. This would put the initiative in the hands of an 8 per cent minority of a pronounced minority. Government by election may become as annoying and undesirable as "government by injunction" was ever painted. A due regard for public order requires that it be kept within constitutional bounds.

It is quite manifest that "the constitution as it is" requires all the votes cast for B, for C and for K and "scattering" to make up "the whole number of votes cast for justice of the supreme court." The votes for C, K and "scattering" were not cast for Governor, senator or justice of the peace. Just as those cast for B were for justice of the Supreme Court, so are the others. In short, confronted with the probability that there would often be more than two places to fill in the membership of the Supreme Court requiring of each elector two or more votes for that office and that it was impractical, if not impossible, to ascertain with exactness the number of

legal voters in the state at any time, the people have adopted a convenient, though arbitrary, rule for fixing the basis upon which the percentage at the rate of 8 per cent shall be calculated. It is always practicable to refer to the official canvass of votes on file in the office of the Secretary of State and ascertain how many votes were cast for justice of the Supreme Court at the last preceding election.

It is true that in *State ex rel.* v. *Kozer,* 105 Or. 486 (210 Pac. 179), and in *Kellaher* v. *Kozer,* 112 Or. 149 (228 Pac. 1086), there are *dicta* assuming without any discussion whatever of the Constitution that a certain number of votes was necessary for a valid initiative petition. These *dicta* certainly cannot fairly be construed in a manner subversive of the plain language of the Constitution. Neither are we to receive or be bound by, as conclusive, the uncontested practice in isolated cases of the Secretary of State in filing initiative petitions. The mere passive acquiescence in a practice should not be permitted to undermine and eventually overthrow the plain mandates of the organic law. The alternative writ is insufficient because it contains in vital particulars only conclusions of law and not basic facts from which the court can draw the conclusion desired. Even granting that the argument on the demurrer can fairly be deemed apropos to the allegations of the writ, yet we ought to attend to the language of the Constitution and not construe it out of existence. For these reasons I dissent.