Argued September 15, affirmed September 22, 1966

KAYS ET AL *v.* McCALL, BRUMMEL ET AL

418 P. 2d 511

*Carl R. Neil,* Portland, argued the cause for intervenor-appellants. With him on the briefs were Thomas R. Mahoney, Gunther F. Krause, and Krause, Lindsay & Nahstoll, Portland. Robert Y. Thornton, Attorney General, and Louis S. Bonney, Assistant Attorney General, Salem, filed briefs for appellant Tom McCall.

*John C. Beatty, Jr.,* Portland, argued the cause for respondents. With him on the brief were William C. Martin, Frederick T. Smith, and Dusenbery, Martin, Beatty, Parks & Templeton, Portland; Sidney E. Thwing and Thwing, Ferris, Atherly & Butler, Eugene; George H. Corey and Corey, Byler & Rew, Pendleton; Robert L. Ridgley, Portland, and Orval Etter, Eugene.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

PER CURIAM.

This is a suit to enjoin the Secretary of State from certifying a proposed initiative amendment to the

Oregon Constitution which would limit property taxes to 1½% of market value. The certification is attacked on the ground that the petition filed with the Secretary of State by the sponsors of the proposal did not contain the requisite number of certified signatures. A three-judge trial court held the certification defective and enjoined the Secretary of State from certifying the measure to the county clerks for printing upon the ballot for the November 8, 1966 general election.

The present appeal presents two questions for determination: (1) Is the correct basis for computing the number of signatures required on a state-wide initiative petition the highest number of votes received by a single candidate for the state Supreme Court at the previous general election, or is it the highest number of votes cast for any one Supreme Court position at such election? (2) Can signatures which are not certified on the final day for filing, but which are subsequently certified be counted toward the total valid signatures on the petition? On the first issue the trial court held the proper basis for computation was the highest number of votes cast for any one *position*. On the second question the trial court held that only those signatures which are certified by the filing deadline may be counted.

Art. IV, § 1 of the Oregon Constitution provides in part as follows:

"* * * The first power reserved by the people is the initiative * * * and not more than 10 percent of the legal voters of the state shall be required to propose any constitutional amendment by such petition * * *. The whole number of votes cast for justice of the Supreme Court at the regular election last preceding the filing of any petition for the initiative * * * shall be the basis on which the

number of legal voters necessary to sign such petition shall be counted. * * *"

On July 7, 1966, the final day for filing the petition,[1] the sponsors filed a petition with 62,891 signatures which were certified by the county clerks as required by ORS 254.040.[2] At the same time, 12,000 additional uncertified signatures were filed with the Secretary of State, of which 11,474 were certified after July 7, 1966. Prior to filing, the sponsors of the petition were advised by the Director of Elections that only 57,779 certified signatures were necessary to satisfy the requisite constitutional percentage. He arrived at this conclusion by taking 10% of 577,793,

---

[1] Art. IV, § 1 provides: "* * * Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon."

[2] "254.040. **Verification of Signatures.** (1) Every sheet of each initiative or referendum petition containing signatures shall be verified on the face thereof by the affidavit of the person who circulated the sheet, stating that every person who signed the sheet did so in his presence and that he believes that each signer stated his correct residence address and is a registered elector.

"(2) The county clerk of each county in which a petition is signed shall compare the signatures of registered electors signing it with the signatures of registered electors on the register of electors and shall make and attach to the petition his certificate stating the number of signatures he believes to be genuine. The certificate is prima facie evidence of the facts stated therein and of the qualifications of the registered electors whose signatures are included in the number certified to be genuine.

"(3) The Secretary of State shall count only the signatures on the petitions that are included in the number certified by the county clerk to be genuine and those remaining signatures that are proved to be the genuine signatures of registered electors by the official certificate of a notary public of the county in which the signer resides.

"(4) The county clerk shall not retain in his possession any petition or any part of one for longer than two days for the first 200 signatures on it and one additional day for each 200 additional signatures, or fraction thereof, on the sheets presented to him. At the expiration of that time he shall deliver it to the person from whom he received it, with his certificate attached."

the vote cast at the November, 1964 general election for Kenneth J. O'Connell, who was unopposed in his bid for re-election to position No. 2 on the Oregon Supreme Court. At the same election, Ralph Holman and Edward Howell were in contest for Supreme Court position No. 7. The total votes cast for both Holman and Howell was 653,117.

The Director of Elections arrived at his conclusion on the theory that the votes cast for a *single* candidate rather than for the *position* was the base upon which to apply the required percentage. The conclusion was reached in the face of a contrary practice over a period of 30 years by his predecessors in office, who had employed as the constitutional base the whole number of votes cast for a position rather than for a single candidate.[9] The Director of Elections changed the method of computation because he was of the opinion that prior administrative practice was incorrect. He based this conclusion on the ground that the case of *Othus v. Kozer*, 119 Or 101, 248 P 146 (1926) was controlling. It is true that in the *Othus* case the court used the greatest number of votes any candidate received as a base for computing the constitutional percentage. But, as Mr. Justice BAILEY explained in *State ex rel Postlethwait v. Clark*, 143 Or 482, 494, 22 P2d 900 (1933), this was done because "at the time the decision in the Othus case was rendered (July, 1926), it was impossible to approximate the 'whole number of votes cast for justice of the supreme court',

---

[9] The official records of the office of the Secretary of State show that from 1930 to 1960, without exception, each Secretary of State employed as a base figure representing the whole number of votes cast as a basis for the initiative, all of the votes cast for that position of justice of the Supreme Court for which the highest number of votes were cast.

See also 16 Ops. Att. Gen., p. 14 (1932-34).

as there were two justices to elect and the names of three candidates appeared on the ballot. The two candidates receiving the greatest number of votes were elected." The court in the *Othus* case noted that there was "no way of ascertaining with any degree of certainty the number of voters who voted for justice of the Supreme Court without opening the ballot-boxes and actually examining each ballot," (119 Or at 106) and decided that under the circumstances the best possible, although admittedly imperfect, estimate was the number of votes cast for a single candidate. Mr. Justice BAILEY went on (*State ex rel Postlethwait v. Clark, supra* at 494) to explain that when the legislature in 1929 provided that aspirants for the Supreme Court were to be candidates for a numbered position, the difficulty encountered in the *Othus* case was no longer presented and that under the new system "the greatest number of votes cast for all the candidates for any one position in the Supreme Court more nearly approximates 'the number of electors who voted * * * at the preceding election for justice of the supreme court' than would result from following the method adopted in the Othus case."

■ In light of this clear explanation of the inapplicability of the *Othus* case after the 1929 change in the method of electing justices of the Supreme Court, it is difficult to understand how the Director of Elections and his advisors could have reached a contrary conclusion. We hold, therefore, that the trial court correctly held that the highest number of votes cast for any one Supreme Court position is the proper basis upon which to compute the number of signatures required on a state-wide initiative petition.

We turn to a consideration of the second issue raised on this appeal. The intervening defendants

contend that the Secretary of State is required to count signatures on the petition submitted on July 7, 1966, even though not certified on that date, if the signatures are later certified and returned to the Secretary of State for filing. If this position is accepted, the petition in the present case, although lacking the requisite number of certified signatures on July 7, 1966, became valid by the subsequent certification of a sufficient number of additional signatures after that date.[4]

Art. IV, § 1 of the Oregon Constitution provides that "initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon." The constitution does not purport to prescribe all of the requirements for a valid petition. It contemplates implementation by legislation.[5] ORS 254.040 implements the constitution by requiring certification of signatures for a valid petition. Defendants do not contend that the legislature cannot prescribe reasonable requirements to assure the verity of initiative petitions.[6] But defendants, in effect, argue that legislative requirements need not be met at the time the petition is filed if the requisite number of signatures appear on the petition. This is patently untenable. The

---

[4] On July 7, 1966 copies of the initiative petition were filed with the Secretary of State containing somewhat in excess of 74,891 signatures of which 62,891 were certified. Of the 12,000 plus remaining signatures, 11,474 were duly certified between July 7 and July 30, 1966, thus making the total number of certified signatures 74,365.

[5] Art. IV, § 1 also provides that "* * * petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the Act submitting this amendment, until legislation shall be especially provided therefor."

[6] Nor could they so contend in light of Kellaher v. Kozer, 112 Or 149, 155, 228 P 1086 (1924).

purpose of the constitutional deadline would then be vitiated since it would not be possible to determine whether the petition was valid until some indefinite time after the deadline. By this reasoning the Director of Elections might not know whether the petition was valid until the very eve of the election. This could produce an intolerable situation because the Director of Elections might not be able to make the necessary preparations for putting the issue on the ballot, which is the very purpose of the constitutional deadline.

■ *Kellaher v. Kozer*, 112 Or 149, 228 P 1086 (1924) is directly in point, holding that after the constitutional deadline a petition cannot be withdrawn for the purpose of having signatures certified. Cases from other jurisdictions reach similar conclusions.[⊙] We believe that these decisions are sound for the reason we have given above.

■ Defendant-intervenors argue that the rule recognized in the *Kellaher* case makes certification of the requisite number of signatures prior to the deadline depend upon the uncontrolled discretion of the county clerk. This is not true. ORS 254.040 provides that:

"* * * (4) The county clerk shall not retain in his possession any petition or any part of one for longer than two days for the first 200 signatures on it and one additional day for each 200 additional signatures, or fraction thereof, on the sheets presented to him. At the expiration of that time he shall deliver it to the person from whom he received it, with his certificate attached."

This section imposes upon the county clerk the duty

[⊙] Christensen v. Baker, 138 Colo 27, 328 P2d 951 (1958); Kochen v. Young, 252 Iowa 389, 107 NW2d 31 (1961); In re Opinion of the Justices, 116 Me 557, 103 A 761 (1917); In re Opinion of the Justices, 114 Me 557, 95 A 869 (1915); Aad Temple Building Assn v. City of Duluth, 135 Minn 221, 160 NW 682 (1916); Simons v. Monson, 95 Utah 552, 83 P2d 266 (1938).

to certify signatures at the minimum rate specified in the statute. The legislature must have intended that the sponsors of an initiative petition be required to submit signatures to the county clerk far enough in advance of the deadline to make it possible for him to certify the signatures at the rate of 200 each day after certifying the initial 200 signatures.

Defendants argue that this imposes an unreasonable burden upon the sponsors of initiative measures because it requires the submission of signatures for certification too far in advance of the deadline. Thus, it is pointed out, the submission of the 53,224 signatures obtained in Multnomah County would have had to begin at least 267 days before the deadline. However, defendants do not explain why the necessity of beginning this long prior to the deadline is unreasonable. In fact, the sponsors in the present case commenced submitting the petition in November, 1965 and continued to do so until the afternoon of July 7, 1966, a period not much less than the 267-day period which the intervening defendants describe as unreasonable. The intervening defendants would certainly be forced to admit that the sponsors of a petition were expected to allow some reasonable period of time for the certification of signatures by the county clerk. What period of time would this be? The certification of a minimum number of signatures within a specified time, as the statute now requires, is the only reasonable method that can be adopted to establish the county clerk's duty and to give the sponsors a calculable base to compute the time necessary to meet the deadline. It is possible that the minimum of 200 signatures per day, adequate in 1917 when the statute was enacted,[9] should

_____

[9] Or Laws 1917, ch 176, § 1.

now be increased. But that is a matter for legislative action.

■ We must also note that ORS 254.040 (3) provides another method of certifying signatures open to sponsors:

"* * * (3) The Secretary of State shall count only the signatures on the petitions that are included in the number certified by the county clerk to be genuine and those remaining signatures that are proved to be the genuine signatures of registered electors by the official certificate of a notary public of the county in which the signer resides."

This permits the sponsor of a petition to recruit the services of a notary public in addition to those of the county clerk in certifying petition signatures. The intervenor-defendants argue that "this method of verification is impractical when large numbers of signatures must be obtained," because the notary can verify the signatures only by consulting the county registration records.[9] This may be true but, as we have already pointed out, the methods by which initiative petition signatures are to be certified has been designed by the legislative assembly and if those methods are outmoded and impracticable, it is for the legislative assembly and not for this court to revise them.

■ All of the criticism which the intervening-defendants have levelled at procedures for certifying signatures, even if true, is beside the mark in the present case. The record reveals that the failure of the sponsors to obtain the requisite number of signatures was not the result of any delinquency on the part of

[9] Prior to 1957 it was not necessary for a person to register in order to qualify as a legal voter. ORS 254.040 was amended by Oregon Laws 1957, ch 608, § 168 to require registration.

the registrar of elections in employing a sufficient work force to certify the requisite number of signatures before the deadline.

The registrar of elections of Multnomah County, at a cost of $10,000, employed 30 persons in addition to his regular staff to verify petition signatures.[10] It is apparent that he keyed his effort to the task of certifying 57,779 signatures—relying upon the declaration of the Director of Elections, and it is reasonable to assume that he would have employed additional persons or would have worked his staff overtime if he had realized that additional certified signatures were necessary.

The intervening defendants rely upon a statement in *State ex rel Trindle v. Snell,* 155 Or 300, 308, 60 P2d 964 (1937), taken from *State ex rel Carson v. Kozer,* 105 Or 509, 210 P 172 (1922), in which the validity of an initiative petition was also under attack. The court said, " 'The constitutional right of electors to sign such a petition and have their signatures counted should not be thwarted by any careless, ignorant or even willful act of a ministerial officer.' " The statement, however, is inapposite because, as we have already pointed out, the failure to obtain the required number of valid signatures was not due to any delinquency on the part of the registrar of elections.[11] The most that can be

---

[10] More than 17,000 of these signatures were submitted within the last ten working days prior to the deadline.

[11] It is appropriate to note also that in the *Trindle* case the court said:

"* * * The secretary of state is a ministerial officer who has no right to waive any requirement set forth in § 36-2004. The requirements of that section of our laws are clearly expressed and contemplate that those who desire to avail themselves of the initiative and referendum powers must file
(Continued on page 372)

said is that the registrar relied upon the erroneous conclusion of the Director of Elections.

Defendants urge, in effect, that because they relied upon the declaration of the Director of Elections we should treat their petition as valid even though it fails to meet the statutory standard. Defendants, proceeding on the assumption that the *Othus* case (119 Or 101, 248 P 146) is controlling and that it would be necessary to overrule it if we were to hold the petition invalid, request us to overrule *Othus* prospectively only and not make our holding applicable to the present case. As we have already explained, the *Othus* case is not controlling. Consequently, it is inappropriate to speak of "overruling" it in any sense, prospectively or otherwise.

■ Stripped of its argumentative trappings, defendants' contention amounts to no more than a request that we give judicial sanction to an erroneous administrative determination simply because it was relied upon by them. This would indeed be a dangerous doctrine. It would, in effect, substitute administrative judgment for that of the judiciary. There is abundant authority recognizing that this should not be done.[12]

---

(Continued from page 371)

petitions in compliance with that law. This petition while legally sufficient in form was not legally sufficient when the facts concerning it had become known." 155 Or at 309.

[12] DeWeese v. Smith, 106 Fed 438, 445 (8th Cir 1901): "The decisions of the officers of the executive departments of the government upon the construction of the acts of congress are not conclusive, and the duty of a court to exercise its own judgment in considering and determining the issues presented to it is imperative and unavoidable. Hence, where the terms and meaning of an act of congress are plain, and a court is convinced upon reason and authority that a correct determination of the question before it requires a decision contrary to the construction and

(Continued on page 373)

A summary of defendants' arguments makes it apparent that they are requesting this court to engage in a drastic and unprecedented renovation of the law, clearly beyond the limits of constitutional and legislative authority. Thus, as we see it, we are asked to disregard the constitutional deadline for filing petitions, to overrule the *Kellaher* case, to apply the *Othus* case which is clearly distinguishable from the present case, to abdicate our judicial function by substituting for our judgment a clearly erroneous administrative pronouncement. This is asking too much.

We fully appreciate the importance of the issue which the sponsors of the 1½% tax limitation measure seek to submit to the people for decision. However, we are compelled to hold that the petition is invalid.

We unqualifiedly endorse the principle that election laws should be liberally construed. As was said in *Othus v. Kozer*, 119 Or 101 at 109, 248 P 146 at 149, "The great constitutional privilege of a citizen should not be taken away by a narrow or technical construction of a law regulating the exercise of such right." Where there is a doubtful construction, "the doubt should be resolved in favor of the people to initiate a law if they see fit so to do."

If, by any reasonable construction, the initiative petition in this case could have been adjudged valid, we would have sustained the Secretary of State's cer-

---

(Continued from page 372)

practice of the officers of an executive department of the government, that determination must prevail, and that decision must be rendered. The courts cannot lawfully renounce their judicial powers in favor of opinions of officers of other departments." To the same effect see, Webster v. Luther, 163 US 331, 342 (1896); McCarthy v. Coos Head Timber Co., 208 Or 371, 404, 302 P2d 238 (1956); Hopkins v. State, 193 Md 489, 69 A2d 456 (1950). See also, Belton v. Buesing, 240 Or 399, 411, 402 P2d 98 (1965).

tification. But we are unanimous in concluding, as the trial court did, that the constitutional and statutory provisions are susceptible only to the construction which we have employed. We reluctantly conclude that the petition must be held invalid.

The decree of the trial court is affirmed.