Argued November 2, 1972, affirmed February 15, petition for rehearing denied March 30, 1973

STATE OF OREGON, *Respondent, v.* RONALD K. CAMPBELL, *Appellant.*

STATE OF OREGON, *Respondent, v.* SYLVAN CAMPF, *Appellant.*

STATE OF OREGON, *Respondent, v.* ED COLLINS, *Appellant.*

506 P2d 163

*Ridgway K. Foley, Jr.,* Portland, argued the cause for appellants. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe, Francis E. Harrington and Maurice D. Sussman.

*John H. Clough,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solictor General.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, HOWELL and BRYSON, Justices.

McALLISTER, J.

Petitioners were convicted by the court without a jury of violation of ORS 254.590:

> "No person shall give, pay or receive any money or other valuable consideration for securing signatures of electors upon any petition for the initiation of any measure or referendum on any measure or for the recall of any public officer."

A violation of this statute is a misdemeanor.

In a consolidated appeal the Court of Appeals affirmed the convictions, 498 P2d 836 (1972), and we granted review. The case involves the proper construction of the statute and its constitutionality. Petitioners Collins and Campf also contend that, as to them, there is no evidence to support a finding of guilt.

Petitioners Collins and Campf sponsored a referendum campaign, in order to secure a popular vote on the cigarette tax measure enacted by the 1971 Legislature. They hired petitioner Campbell to conduct the petition drive, under a contract which provided in part as follows:

> "Whereas Sylvan Campf and Ed Collins, hereinafter called 'sponsors', are sponsors of a petition for a referendum * * * and need to get the signatures of more than 26,000 voters on the petition; and

> "Ronald K. Campbell, hereinafter called 'canvasser', is willing to recruit a crew to get such signatures and have them to sponsors in time to file them with the Secretary of State' * * *

> "Canvasser is to recruit persons to circulate petitions and obtain signatures of registered voters. * * * He is responsible for collecting signatures throughout the state.

"Canvasser is to secure not less than 25,000 valid signatures * * *.

"Canvasser is to bear all expenses for his office and telephone. He is to pay his employees at least the minimum hourly wage required by law and all wages, taxes thereon and license expense is to be borne by him. * * *

"Canvasser is to receive for his services the sum of Six Thousand Dollars ($6,000.00) from which he shall pay all wages, taxes and other expenses, and if he shall by obtaining sufficient valid signatures be the primary cause of getting the referendum on the ballot shall receive the additional sum of Twenty-Five Hundred Dollars ($2,500.00)."

Campbell was paid at least $7,500.00 pursuant to this agreement.

Campbell hired canvassers to circulate the petitions and obtain signatures. The canvassers were paid by the hour, with additional payment offered for any signatures obtained after their regular working hours. Campbell instructed the canvassers to try to get ten or twelve signatures an hour.

Collins and Campf were indicted jointly for paying money to Campbell "for Ronald Campbell's securing signatures of electors on a petition for the referral to the people of Chapter 535, Oregon Laws 1971 * * *". Campbell was indicted for paying money to one Stephen Jordan "for Stephen Jordan's securing signatures of electors * * *". All were found guilty by the trial court.[①]

---

[①] A number of the hired circulators were cited for violations of the statute but were never prosecuted. Petitioners make this fact the basis of a charge that the prosecutor enforced the statute in a selective and discriminatory manner. We have held

No prior cases have construed ORS 254.590. The Court of Appeals considered the statute quite clear in its application to all three petitioners:

"* * * It clearly forbids paying a person to secure signatures on a petition—precisely what was alleged and proven in the present cases. There is no need to resort to rules of statutory construction when the plain and usual meaning of the words was adequate to warn the defendants of the proscribed activity." 498 P2d at 838.

With specific reference to petitioners Campf and Collins, the Court of Appeals said:

"* * * The finding of the trial court [as to their guilt] is supported by the language of the contract, the initial payment, and the subsequent conduct of the parties which indicates that the sponsors intended their payment to Campbell as compensation for his work in obtaining the required number of signatures." 498 P2d at 837-838.

The Court of Appeals thus held that the statute prohibits not only the compensation of persons who circulate petitions and directly solicit signatures, but also the payment of compensation to a person who organizes and coordinates a referendum, recall, or initiative campaign or who otherwise works to secure the necessary number of signatures.

██ Article IV, Section 1, of the Constitution of Oregon provides:

"(2)(a) The people reserve to themselves the

---

that such a charge is not a defense for persons whom the prosecutor has chosen to prosecute. State v. Howell, 240 Or 558, 402 P2d 89 (1965); Bailleaux v. Gladden, 230 Or 606, 610-611, 370 P2d 722, cert. denied 371 US 848, 83 S Ct 86, 9 L Ed 2d 84 (1962). There is no need to reconsider that question in the present case, as the record does not show any improper exercise of the prosecutor's discretion.

initiative power, which is to propose laws and amendments to the Constitution and enact or reject them at an election independently of the Legislative Assembly.

\* \* \* \* \*

"(3)(a) The people reserve to themselves the referendum power, which is to approve or reject at an election any Act, or part thereof, of the Legislative Assembly that does not become effective earlier than 90 days after the end of the session at which the Act is passed.

\* \* \* \* \*

"(4)(b) Initiative and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith."

Although the initiative and referendum systems in Oregon date from 1902, the present language is the result of a 1968 amendment to the constitution. The amendment was intended primarily to (1) change the basis for determining the number of signatures required on initiative and referendum petitions and (2) to provide more time for the certification of signatures. At the same time, the initiative and referendum provisions were completely rewritten. From 1902 to 1968 the right of the legislature to legislate in connection with these powers reserved by the people was recognized in the following language:

"\* \* \* Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the Act submitting this amendment, until legislation shall be especially provided therefor." Oregon Const. Art. IV sec 1 (repealed May 28, 1968).

Discussing this legislative power, this court said in

*State ex rel McPherson v. Snell,* 168 Or 153, 160-161, 121 P2d 930 (1942):

> "Section 1 of article IV of the constitution is self-executing, and no enabling act was required to carry it into effect: * * *. Nevertheless, the enactment of legislation to aid or facilitate its operation is not only permissible but seems to be contemplated by the wording of the section: * * *. Any legislation which tends to ensure a fair, intelligent and impartial accomplishment may be said to aid or facilitate the purpose intended by the constitution. Any safeguard against deception and fraud in the exercise of the initiative and referendum powers tends to assure to the electorate the benefits conferred by § 1 of article IV.
>
> "Such legislation, however, must be reasonable, not 'curtailing the right or placing any undue burdens upon its exercise': * * *. Nor may it 'hamper or render ineffective the power reserved by the people': * * *."

In *Kays v. McCall,* 244 Or 361, 418 P2d 511 (1966) we considered the validity of ORS 254.040, which requires the certification of signatures as a prerequisite to filing a petition. It was argued that the statute placed an undue burden on the exercise of the initiative power, because signatures had to be submitted for certification long before the constitutional deadline for filing the petition. In holding that the requirement for certification of signatures prior to filing was reasonable and valid we quoted and relied on the last sentence of the original Article IV, Section 1, dealing with the role of the legislature as quoted above.

However, not every legislative provision which tends to prevent fraud in the exercise of the initiative and referendum is necessarily valid. In *Woodward v. Barbur,* 59 Or 70, 116 P 101 (1911) and in *State ex rel*

*Fleck v. Dalles City,* 72 Or 337, 346-347, 143 P 1127 (1914) it was held that municipal ordinances which restricted the right to sign petitions to registered voters were invalid because in conflict with the constitutional provision extending the right of initiative to the "legal voters" of municipalities.[⊕] The restriction of the right to registered voters was not saved because the ordinances tended to prevent fraud by requiring the comparison of signatures on petitions with those in the registration book.

The present language of subsection (4)(b), providing that initiative and referendum measures are to be submitted "as provided in this section and by law not inconsistent therewith," certainly permits no greater legislative interference with the people's powers of initiative and referendum than did the earlier language. Whether it further restricts the legislative power to legislate in connection with initiative and referendum need not be decided at this time. The explanation of the 1968 amendment in the official Voters' Pamphlet indicates that there was no intention in the drafting of the amendment to change the role of the legislature in connection with the exercise by the people of the initiative and referendum. "These repealed sections," the voters were told, "are purely 'clean-up' of the wording and in no way do they diminish the power of the people to initiate or refer measures." Official Voters' Pamphlet, Primary Election, May 28, 1968, p 8. Since neither party has suggested that the 1968 amendment is significant in this case and since both have relied on cases decided under the

---

[⊕] At the time those cases were decided, a citizen was not required to be registered in order to be a legal voter. Registration is now a constitutional requirement. See Oregon Constitution, Article II, Section 2.

original language of Article IV, Section 1, we will assume that the 1968 amendment has made no substantive change in the authority of the legislature in connection with the initiative and referendum.

■ ORS 254.590 does not directly conflict with the provisions of the constitution, which are silent as to the means of securing signatures. However, in the absence of a direct conflict, we must still determine whether the statute is a reasonable regulation which facilitates the proper exercise of the initiative and referendum, or whether by placing undue burdens on that exercise it is inconsistent with the reservation of those rights by the people. Petitioners argue that the statute severely hampers the people in their exercise of those rights, contending that a petition campaign which relies on volunteer circulators is nearly always doomed to failure. There is evidence that early in the history of the initiative and referendum in this state the use of paid circulators was thought to be necessary to a successful campaign. In Barnett, The Operation of the Initiative, Referendum, and Recall in Oregon 59-60 (1915) the author summarizes the early experience:

> "At times attempt has been made to procure the required number of signatures for very meritorious measures without the aid of paid circulators, but, finally, in most cases, the promoters of the measures have been compelled to resort to the usual method. Necessity for reliance upon paid circulators has been largely reduced when the promoters of measures have had strong organizations back of them. But paid circulators were found necessary even in the case of the direct primary bill, the corrupt-practices bill, the presidential primary bill, and the constitutional amendments for the recall, home-rule city charters, and local initiative and

referendum, all very popular and all promoted by the strongly organized People's Power League. The State Grange, in spite of its strong organization, could not secure enough signatures for the gross-earnings corporation-tax bills without payment for the circulation of petitions, and the same is true of the State Federation of Labor in case of the employers' liability bill. Yet these measures were approved at the polls by large majorities. So the 'industry' of 'petition peddling' has been developed to meet these conditions. * * *"

And in *State ex rel McNary v. Olcott,* 62 Or 277, 284, 125 P 303 (1912) the court recognized the same situation:

"* * * That there was no general and spontaneous desire on the part of the general public to withhold the appropriation from the university soon became apparent, and the promoters were compelled to employ an attorney to secure the necessary signatures. This in itself was not an unusual course, as it is difficult to find citizen[s] who are so devoted to their principles as to be willing to circulate such petitions without compensation. * * *"

But these observations, however accurate at the time they were made, lose considerable force when we remember that ORS 254.590 has been in effect since 1935 (see Or Laws 1935 c 41 § 1) and that many successful petition campaigns have been conducted since its passage. Petitioners presented no evidence to indicate that the statute has unduly hampered petition campaigns during this period.

On the other hand, a prohibition on the use of paid circulators may well tend to reduce the temptations to fraud. In *State ex rel McNary v. Olcott,* supra,

it was disclosed how paid circulators had engaged in systematic forgery:

"[The attorney hired by the promoters] employed a large number of circulators, who went forth into the highways and byways to procure signatures. Seven of these, at least, devised an easy method of earning their money. They would get together and pass their petitions around, each signing a few names in a disguised hand, thus minimizing the chance of detection. * * * Other signatures to the number of 800 were discovered by Mr. Parkinson to be forgeries, and were eliminated from the petitions before filing. The petition as filed contained 13,715 names. Of these, it is admitted that 3,778 are forgeries, perpetrated by dishonest circulators." 62 Or at 285.

Barnett suggests that unsavory practices by paid circulators were fairly widespread:

"The fraudulent practices of hired circulators have recently caused more discussion in Oregon than any other matter concerning direct legislation, and have been the cause of most of the present agitation for changes in the initiative and referendum laws. How extensive such fraudulent practices have generally become it is impossible to say. There has been nothing like a thorough investigation of the petitions except in a few cases, but the fraud disclosed by such investigations creates a suspicion that very much more fraud remains undisclosed. * * *" Barnett, supra, at 65.

The use of paid circulators continued to cause unfavorable comment. The following is from an editorial appearing in the Corvallis Gazette-Times:

"The state has lost practically a year of road work as a result of the initiative measure designed to change the cost of auto licenses.

"No election year ever passes without some equally vicious use of the initiative. This year's effort to make use of this weapon of legislation too

easily handled by unscrupulous and insincere hands, is but a repetition of former scandals in the same field. * * *

"This legislature should take steps to amend the law, or submit an amendment if necessary, throwing more stringent safeguards around the initiative. There are various ways of doing this. At least two changes we think ought to be made—the number of signatures required ought to be increased and it should be illegal to hire petition hawkers." (Reprinted in 55 Oregon Voter 322 (1928).)

Four years later the editors of the Oregon Voter, in the course of a discussion of problems in the operation of the initiative, referendum, and recall system, observed that completed petitions, or threats of petition campaigns, had been used for purposes of political intimidation and attempted extortion:

"There is no limit to the racketeering that can be done in circulating initiative, referendum and recall petitions unless the present wide open holes in the Oregon election law are closed up. So long as these holes remain open, they are invitations to racketeers and gangsters to come into the state and ply their nefarious hold-up schemes at the expense of susceptible interests." 70 Oregon Voter 72 (1932).

Public opinion, it was suggested, was likely to favor the abolition of paid circulators in order to control these practices, a remedy characterized as "drastic." *Id.* at 74-76. In 1935, when ORS 254.590 was enacted, that same publication viewed the event as a "momentous change":

"* * * It will be several years before our people really realize the difference in the Oregon System without paid petitions and what was endured for so many years under the legalized hawking of petitions." 80 Oregon Voter 249-250 (1935).

Of course, volunteer circulators might also be tempted to engage in improper practices in order to secure signatures. Nevertheless, a person who is only concerned with securing signatures in order to earn money probably would be more likely to engage in fraud. Moreover, the requirement that those who circulate petitions do so without pay provides an effective check on sponsors who would use the direct legislation process for improper purposes. The evils at which the statute was directed were real, and we are not convinced by petitioners' arguments that, in attacking these abuses, the legislature placed too great a burden on the legitimate exercise of the initiative and referendum powers by the people. We hold that, insofar as ORS 254.590 prohibits the use of paid canvassers to personally solicit signatures, it is a valid regulation permitted by Article IV, Section 1, of our Constitution.

As construed by the Court of Appeals, however, the statute would also prohibit the sponsors of a signature campaign from hiring and paying anyone to assist them. The language of the statute, which makes it illegal to pay consideration "for securing signatures of electors" does not require this construction. Certainly the ultimate objective of any initiative or referendum campaign is to secure signatures, and any person paid for his time and effort in such a campaign could be said to be paid "for securing signatures." However, it is at least equally possible to construe the statute as prohibiting only the payment of canvassers who personally solicit signatures.

If the statute is construed to prohibit all payment of compensation to persons concerned with securing signatures, including persons who undertake to organize or administer an initiative or referendum

campaign, or who perform clerical or other work not involving the direct solicitation of signatures, the exercise of the people's right of direct legislation would be drastically limited. The job of recruiting and organizing volunteer canvassers for a state-wide signature campaign is a large one. It is unrealistic to expect that such a job could be adequately done by a part-time volunteer staff. Ad hoc organizations, without regular staff, would be severely hampered if they could not use any paid workers in connection with a petition drive.

In *Othus v. Kozer,* 119 Or 101, 109, 248 P 146 (1926) the court said:

"* * * We have before us an act which is of doubtful construction. It would seem that the doubt should be resolved in favor of the exercise of the right of the people to initiate a law if they see fit to do so. * * *"

In other cases involving the initiative and referendum, this court has been diligent to construe regulatory legislation in favor of the people's exercise of those rights. *State ex rel McPherson v. Snell,* supra, 168 Or at 161-162; *State ex rel Carson v. Kozer,* 108 Or 550, 555-556, 217 P 827 (1923). See, also, *Miles v. Veatch,* 189 Or 506, 529-532, 220 P2d 511, 221 P2d 905 (1950); *Kays v. McCall,* supra, 244 Or at 373-374.

In the present case we have not only an act of "doubtful construction;" we have also the additional consideration that the construction adopted by the Court of Appeals would render the statute of doubtful constitutionality. We hold, therefore, that ORS 254.590 prohibits the payment of compensation only to those who personally solicit or secure signatures on initiative and referendum petitions. This construction

disposes of petitioners' challenge based on Article IV, Section 1, of our Constitution, and also makes untenable the charge that the statute is void for vagueness. We do not think it necessary to discuss petitioners' other constitutional challenges to the statute, noting only that we find them to be totally without merit.

Petitioners Campf and Collins contend that, as to them, there was no evidence to support the trial court's finding of guilt. It is clear from what we have said that their conviction cannot be based merely on the evidence that they paid Campbell to organize and conduct the petition drive. There is no evidence that they hired Campbell to personally solicit signatures, or that they contemplated that he would do so.[9] The contract provided that Campbell was to "recruit persons to circulate petitions and obtain signatures of registered voters." The contract also provided, however, that Campbell was to "pay his employees" the minimum wage, and that he was to "pay all wages" out of the fee paid him by Campf and Collins. The terms of the contract itself are sufficient evidence to support a finding that Campf and Collins intended that Campbell hire and pay canvassers with money which they were to furnish him. The trial court, in an oral opinion, made such a finding:

"* * * I think the evidence shows clearly that the defendants Campf and Collins paid the money, and were aware of what it was going to be used for

---

[9] Exhibit 8, admitted in evidence, is a certified copy of a group of signature sheets attested by Campbell as circulator. Neither the trial court nor the Court of Appeals attached any significance to this exhibit; because we find no evidence that Campbell was hired to personally circulate the petitions, we have not considered this evidence as tending to show guilt on the part of petitioners Campf and Collins.

and were aware that it was used for the purposes indicated, namely paying canvassers and that therefore their conduct comes within the band [sic] of the statute just as much as Mr. Campbell's does. * * *"

■■ Although Campf and Collins did not directly participate in the hiring and payment of the canvassers, direct participation is not necessary to support the conviction. ORS 161.220, in effect at the time of the acts involved in this case, provided:

"* * * All persons concerned in the commission of a felony or misdemeanor, whether they directly commit the act constituting the crime or aid and abet in its commission, though not present, are principals and shall be indicted, tried, and punished as principals." [Repealed Or Laws 1971 c 743 § 432.]

Discussing this statute, we said in *State v. Moczygemba,* 234 Or 141, 144-145, 379 P2d 557 (1963):

" '* * * In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." L. Hand, J., in United States v. Peoni, 100 F2d 401, 402.' Nye & Nissen v. United States, 336 US 613, 93 L Ed 919.

It is, therefore, self-evident that if two or more persons plan or conspire to commit a criminal act to effectuate a common purpose, though only one of them actually commits the deed, the other or others have aided or abetted. State v. Brown, 113 Or 149, 231 P 926."

See, also, *State v. Glenn,* 233 Or 566, 379 P2d 550 (1963) and *State v. Blackwell,* 241 Or 528, 407 P2d 617 (1965). In the latter case, where the proof was that the

defendant forced another to perform the act with which he was charged, we said:

"\* \* \* The broad principle is that one can be indicted for an act and convicted upon proof that the defendant did not personally do the act but was the prime mover in having another, voluntarily or involuntarily, perform the actual act." 241 Or at 531.

In *State ex rel Kruckman v. Rogers,* 124 Or 656, 265 P 784 (1928), a contempt case, the court applied the principles of the criminal law in affirming a contempt conviction based upon proof that the defendant's violation of the decree was accomplished through an agent. The court said:

"\* \* \* All that is essential to make the principal criminally answerable for the criminal acts of his agent, is that the acts shall be done by his authority. When the principal, though not present, has expressly or impliedly commanded, encouraged, incited or induced his agent to do a criminal act, he is liable criminally therefor. Where the business itself, as it did here, involves a violation of a lawful decree, the authorization of an agent by the principal to conduct the business will make the principal guilty of contempt when the thing done therein is a violation of the decree. \* \* \*" 124 Or at 659.

As we have said, there was sufficient evidence to support the trial court's finding that Campf and Collins violated the statute through the acts of Campbell, whom they hired for that purpose. Although we have held that their convictions could not be upheld on the theory adopted by the Court of Appeals, it is clear from the record that the trial court did not rely on that theory but specifically found these petitioners guilty because they knowingly employed Campbell to hire canvassers and paid him money to be used for

that purpose. It follows that the convictions of all petitioners will be affirmed.

O'CONNELL, C.J., Specially Concurring.

I concur in the result but I would not reach it on the grounds stated in the majority opinion.

The majority interprets the contract between Campbell and Campf and Collins to require Campbell to compensate the persons circulating the referendum petitions. I find nothing in the written contract itself or in the circumstances attending its execution which forces the interpretation adopted by the majority. The contract is equally susceptible to the interpretation that Campbell was obligated only to pay the wages of the office staff and any other employees who could be paid without violating the statute (ORS 254.590).

When a contract is susceptible to either of two interpretations, one of which renders the contract illegal and thus subjects the contracting party to criminal prosecution, and the other rendering the contract legal, the court should favor the latter construction.

I would hold, therefore, that Campf and Collins could not be held liable for Campbell's conduct in compensating the persons who circulated the petitions. I would, however, hold as the Court of Appeals held that ORS 254.590 was violated by the payment made by Campf and Collins of money to Campbell to obtain signatures.

The majority treats ORS 254.590 as a statute of "doubtful construction" and proceeds then by dictum to make permissible the payment of money to secure signatures if the payment is made indirectly by employing others to see that the job is done. The Court of Appeals, on the other hand, held that there was no

ambiguity whatsoever in the statute, finding that "[i]t clearly forbids paying a person to secure signatures on a petition—precisely what was alleged and proven in the present cases." 10 Or App 255, —, 498 P2d 836 (1972). I, too, find no ambiguity in the statute and so construing it the question of the constitutionality of the statute, then, becomes critical.

The dicta in the majority opinion makes it clear that if the statute were read as the Court of Appeals construed it, the statute would be unconstitutional. I would not agree. I think that the legislature was within constitutional bounds in attempting to provide a safeguard for the referendum and initiative process by inhibiting those with wealth from exercising an unfair advantage by paying for the collection of petition signatures. Concededly, this proscription puts substantial restrictions upon the machinery by which signatures on petitions are collected. But the legislature has decided that the benefits flowing from restricting the influence of wealth in the initiative and referendum process outweigh the harm which would result to the process without the proscription. I do not think that this court has a basis for declaring the legislative judgment unsound.

DENECKE, J., dissenting in part.

I dissent from that part of the majority decision affirming the convictions of defendants Campf and Collins. I concur with Mr. Chief Justice O'CONNELL's specially concurring opinion that the terms of the contract do not provide beyond a reasonable doubt that Campf and Collins knew or intended that Campbell would pay persons who circulated petitions.

I also concur with that part of the Chief Justice's

opinion that the statute would not be in violation of Art IV, § 1, if it were construed to prohibit all payment of compensation to persons who undertake to organize or administer an initiative or referendum campaign. However, I do not believe that is the most reasonable interpretation of the statute; therefore, I cannot adopt the Chief Justice's reasoning in affirming the convictions of Campf and Collins.